**COLUMBIA PORTLAND CEMENT COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 89–6105, 89–6164.

United States Court of Appeals, Sixth Circuit.

Argued July 26, 1990.

Decided Oct. 2, 1990.

John C. Ross (argued), Ross & Robinson, Canton, Ohio, for petitioner cross-respondent.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Howard E. Perlstein, William Stewart, Joseph Bornong, Marilyn O'Rourke Athens (argued), N.L.R.B., Office of the General Counsel, Washington, D.C., and Frederick Calatrello, Director, and Steven B. Wilson (argued), N.L.R.B., Region 8, Cleveland, Ohio, for respondent cross-petitioner.

Before KEITH and GUY, Circuit Judges, and ENSLEN, District Judge.*

KEITH, Circuit Judge.

Columbia Portland Cement Company ("Columbia") petitions this court for review of the May 31, 1989 decision and order of the National Labor Relations Board (the "Board") finding that Columbia violated section 8(a)(1), (3) and (5) of the National Labor Relations Act ("NLRA"), codified at 29 U.S.C. § 158(a)(1), (3), (5). The Board cross-petitions for enforcement of its decision and order. For the reasons set forth below, we **enforce** the decision in part and **reverse** it in part.

## I.

Columbia operates a lime shale quarry (the "mine") and a cement production facility (the "plant") in Zanesville, Ohio.[1] The United Cement, Lime, Gypsum and Allied Workers' International Union, Local No. 24, AFL–CIO (the "union") represents Columbia employees. Columbia purchased the mine and plant from Ashland Technologies on August 28, 1984. Columbia recognized the union and made no substantial changes in its operation personnel. On August 29, 1984, Columbia notified the union that it intended to terminate the prior collective bargaining agreement and requested a meeting with the union to discuss a new agreement. During the negotiating sessions which extended through October 1984, the union requested the processing of certain grievances pending from Ashland Technologies and filed grievances regarding the September 1984 layoffs that occurred as a result of Columbia's cutback in operations.

Columbia and the union failed to reach an agreement on a new collective bargaining contract. Columbia offered its final proposal on October 28, 1984 which contained a new grievance procedure, reducing the size of the employee grievance committee and shortening time limits for invoking successive steps in the grievance process. Columbia informed the union in January 1985 that it had no obligation to process grievances pending from Ashland Technologies' ownership. The new grievance procedure would be applied retroactively to all grievances filed since Columbia's ownership.

Various acts of vandalism were committed during the spring of 1985. As a result, Columbia investigated and interviewed some employees without a union representative present. Robert Wartenbe ("Wartenbe") and Robert Barrett were summoned to speak with the investigator on April 18 and 19 respectively. When Wartenbe and Robert Barrett refused to answer questions without union representation, they were suspended. At an April 1985 union meeting, the employees dis-

---

* The Honorable Richard A. Enslen, United States District Judge for the Western District of Michigan, sitting by designation.

1. Limestone is excavated and crushed at the mine and then conveyed to the plant where it is blended, heated in a kiln and ground into cement. The plant and mine occupy an unfenced area measuring hundreds of acres with several entrances and exits. In May 1985, the mine operated two ten-hour production shifts from 7:00 a.m. to about 3:00 a.m. Maintenance employees fueled, oiled and repaired the machines from 11:00 p.m. to 7:00 a.m. The plant operated twenty-four hours daily on shifts beginning at 7:00 a.m., 3:00 p.m. and 11:00 p.m.

cussed: the changes in the grievance procedure; the denial of representation to employees subject to investigatory interviews; and the discontinuation of a policy to provide employees free work gloves. At the conclusion of the meeting, the employees voted unanimously to authorize Donald Fisher, union president, to call a strike at any time.

On May 7, 1985, the Board agent investigating the union's previously filed unfair labor practice charges told Donald Fisher that the Board's Regional Director, acting on behalf of the Board's General Counsel, intended to issue a complaint alleging that Columbia violated the NLRA by denying union representation to employees in investigatory interviews and discontinuing provision of work gloves. Donald Fisher called a strike on the morning of May 8, 1985.

At about 3:00 a.m. on May 8, 1985, Paul Fisher, union trustee, told kiln operators Wayne Dickson ("Dickson") and Larry Jarvis ("Jarvis") about the strike. Paul Fisher and Dickson informed supervisor Carl Hardin that the employees were going on strike and asked Hardin what should be done with the equipment. Hardin advised them to shut everything down. Dickson explained to Hardin how to prevent the kiln from warping as it cooled down. After about 20 minutes, Hardin indicated that he was satisfied with the shutdown and permitted the employees in the kiln room to leave.

At about 10:00 a.m. when Larry Ousky, vice president of operations for Columbia's parent corporation, arrived at the plant, he found the ventilation improperly set and the kiln shut down. He decided to resume production. The kiln suffered damage which permanently reduced its productive capacity.

Mine superintendent Harold Roberts and other supervisors tested the mining equipment in the afternoon. Much of the equipment had been sabotaged by placement of pins or bolts in vital engine parts or by addition of foreign substances to the fuel.

Columbia discharged Russell Barrett ("Barrett"), James Dalrymple ("Dalrymple"), Terry Frame ("Frame"), Jim Hughes ("Hughes"), Mark Jellison ("Jellison"), Keith Luzadder ("Luzadder"), Homer Searls ("Searls"), Gene Swingle ("Swingle"), and George Williams ("Williams") because they were the last employees either to operate or service equipment at the mine before the strike. Columbia discharged Paul Fisher, Michael Fisher, Michael Corbett ("Corbett"), Joseph Stoneburner ("Stoneburner"), Larry Jarvis ("Jarvis") and Larry Tyo ("Tyo") for leaving the plant allegedly without taking reasonable precautions to avoid damage to Columbia's equipment.

On May 31, 1985, the union made an unconditional offer to return to work on behalf of the employees. On June 5, 1985, Columbia accepted the employees' offer, but refused to reinstate the employees who had been discharged for strike misconduct and destruction of property. On June 12, 1985, all of the employees returned to work, except those Columbia refused to reinstate.

The union filed grievances over most of the discharges. Columbia officials met with union officials on June 18, 1985 to discuss the discharges of Frame, Luzadder, Barrett, Paul Fisher, Michael Fisher and Corbett. Columbia credited Luzadder's and Frame's denial of involvement in the sabotage of equipment and rescinded their termination. Columbia, however, gave Luzadder and Frame five-day suspensions for inadequate production on their last shift. Columbia refused to reconsider the other discharges.

On June 17, 1985, the employees met to discuss their return to work. A representative of the international union attended the meeting and belatedly informed the employees that the international union had approved the strike. Some employees who were not present when the decision to end the strike was made expressed dissatisfaction with that decision. The employees also discussed their dissatisfaction with Columbia's refusal to remedy the causes of the first strike and the discharges that accompanied their return to work. After voting for a second strike, the employees returned to the picket lines on June 18,

1985. The union notified Columbia of the strike about 55 minutes in advance and no damage to equipment resulted.

On February 23–25, 1987, and March 23–24, 1987, administrative hearings were conducted on the union's allegations against Columbia of unfair labor practices. The administrative law judge ("ALJ") issued his ruling on February 24, 1988. Columbia filed timely exceptions to the ALJ's findings on April 22, 1988. On May 31, 1989, a three-member panel of the Board filed its decision and order affirming the ALJ's ruling with limited exceptions which are not raised on appeal.

The ALJ concluded and the Board agreed that Columbia violated 29 U.S.C. § 158(a)(1) by denying Donald Fisher, Marvin Baker, Paul Slack, Wartenbe and Robert Barrett union representation at investigatory interviews and threatening them for their insistence on representation. The ALJ and the Board also concluded that Columbia violated 29 U.S.C. § 158(a)(1), (3) by taking reprisals against Wartenbe and Robert Barrett because of their insistence on representation at investigatory interviews and by discharging or suspending employees Frame, Luzadder, Russell Barrett, Dalrymple, Hughes, Jellison, Searls, Swingle, Williams, Corbett, Michael Fisher, Paul Fisher, Jarvis, Stoneburner and Tyo for participating in the strike commencing on May 8, 1985. The ALJ and the Board further concluded that Columbia violated 29 U.S.C. § 158(a)(1), (5) by refusing to process grievances filed before September 5, 1984 and by insisting that only active employees could participate in processing grievances. The Board also found, for reasons different from those relied on by the ALJ, that Columbia violated 29 U.S.C. § 158(a)(1), (5) by insisting on processing grievances filed between September 5 and October 28, 1984 under the terms of the proposal implemented by Columbia on October 28, 1984. Finally, the Board and the ALJ found that both strikes were unfair labor practice strikes.

The Board ordered Columbia to cease and desist from the unfair labor practices found. The Board also ordered Columbia:

to make whole all employees unlawfully suspended or discharged; to offer reinstatement to all employees unlawfully discharged; to offer full and immediate reinstatement to all employees who struck on June 18, 1985 upon their application for reinstatement; to process grievances filed before October 28, 1984 pursuant to the terms of the collective bargaining agreement that expired September 5, 1984; to rescind its policy recognizing active employees only as employee representatives; and to post an appropriate notice of the policy change regarding employee representatives.

On September 5, 1989, Columbia timely petitioned this Court for review of the Board's May 31, 1989 order. The Board has filed a cross-application for enforcement of its order. Our jurisdiction is founded on section 10(e), (f) of the NLRA, 29 U.S.C. §§ 151, 160(e), (f).

II.

The Board's findings of fact are conclusive if supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e). "The determination of whether employees have exceeded acceptable limits [in the exercise of their rights] must initially rest 'with the Board, and its determination, unless illogical or arbitrary, ought not to be disturbed.'" *Star Meat Co. v. NLRB,* 640 F.2d 13, 14 (6th Cir.1980) (quoting *Ohio Power Co. v. NLRB,* 539 F.2d 575, 578 (6th Cir.1976)).

A.

On appeal Columbia argues that the Board committed reversible error by finding that Columbia unlawfully discharged Hughes, Jellison, Russell Barrett, Dalrymple, Searls, Swingle and Williams for damaging mine equipment during the May 8, 1985 strike. The Board counters that Columbia admittedly has no evidence connecting any specific employee to any particular damage; therefore, Columbia is precluded from asserting a good faith belief that any of the discharged employees were guilty of

misconduct. We find the Board's argument persuasive.

An employer's honest belief that striking employees have engaged in misconduct provides an adequate defense to a charge of discrimination in refusing to reinstate such employees. *See Schreiber Mfg., Inc. v. NLRB*, 725 F.2d 413, 415 (6th Cir.1984) (citation omitted). To lawfully deny an employee reinstatement at the conclusion of a strike, Columbia must produce evidence connecting the discharged employees to specific strike misconduct. *See Methodist Hospital of Ky., Inc. v. NLRB*, 619 F.2d 563, 567 (6th Cir.), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *accord General Telephone Co.*, 251 NLRB 737, 739 (1980), *enforced*, 672 F.2d 894 (D.C.Cir.1981). Columbia fails to satisfy this evidentiary requirement.

Much of the equipment was discovered on May 8 and 9 with engines sabotaged and fuel adulterated. Columbia accused maintenance employees Barrett, Searls, Dalrymple and Swingle of damaging the equipment because they were the only employees working in the mine when the strike actually started. Columbia accused equipment operators Hughes, Williams, Jellison, Frame and Luzadder of damaging the equipment because they were the last employees to use the mine equipment during the second shift which ended at 2:00 a.m. The damage Columbia attributed to the discharged employees reasonably could have been committed by one or a few in the group, by the employees arriving early on May 8, 1985 to begin picketing, or by complete outsiders. We conclude that the evidence fails to provide a sufficient nexus between the discharged employees and the damaged equipment. The Board properly determined that Columbia failed to establish a good faith belief that any of these discharged employees were guilty of strike misconduct. We, therefore, enforce the Board's order to reinstate and make whole the unlawfully discharged mine employees.[2]

## B.

■ Columbia argues that the Board committed reversible error by finding that Columbia unlawfully discharged plant equipment operators Corbett, Paul Fisher, Michael Fisher, Tyo, Jarvis and Stoneburner for failing to take reasonable precautions and to provide adequate notice of the strike to Columbia, thereby creating danger of excessive damage to Columbia's property. The Board responds that substantial evidence supports its finding that the kiln employees reasonably followed supervisor Hardin's instructions before going out on strike, and the other plant employers also took reasonable precautions. We agree with the Board's findings.

A strike characteristically causes inconvenience and economic loss to the employer. Striking employees are under no general duty to minimize the disruption by, for example, notifying the employer in advance of the strike to enable the employer to prepare for the strike. *See, e.g., Johnnie Johnson Tire Co.*, 271 NLRB 293, 294–95 (1984) (absence of advance notice of strike does not preclude NLRA's protection), *enforced*, 767 F.2d 916 (5th Cir.1985); *Go Lightly Footwear, Inc.*, 251 NLRB 42, 44 (1980) (neither undertaking less drastic forms of protest nor provision of advance notice to supervisors required by NLRA). If the striking employees take reasonable precautions to avoid imminent danger to the employer's physical plant, the effect of a work stoppage does not preclude the

---

**2.** As an alternative basis for challenging the Board's finding of a section 8(a)(3) violation, Columbia asserts that the Board should have deferred to the grievance and arbitration process for assessment of the discharges. Columbia cites *Dubo Mfg. Corp.*, 142 N.L.R.B. 431 (1963) for the proposition that the Board generally should defer action on unfair labor practice allegations pending resolution of related grievances that are pending. The rule of *Dubo*, however, is inapplicable in this case because it presumes the existence of a grievance resolution mechanism adopted by agreement. *See id.* at 432. Here, the grievance procedure is nothing more than a unilaterally implemented proposal designed by Columbia. *Cf. Newspaper Printing Corp. v. NLRB*, 692 F.2d 615, 620 (6th Cir.1982) ("Following good faith bargaining to impasse on a mandatory subject, an employer may unilaterally change terms and conditions of employment.").

NLRA's protection. *See Johnnie Johnson Tire Co.*, 271 NLRB at 295. Striking employees may lose the NLRA's protection, however, if the abandonment of their jobs poses a foreseeable risk of damage to their employer's plant and equipment. *Id.* Additionally, the NLRA does not protect striking employees who commit acts of vandalism or sabotage against their employer. *Clear Pine Mouldings, Inc.*, 268 NLRB 1044, 1045 (1984), *enforced*, 765 F.2d 148 (9th Cir.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986).

We find that substantial evidence supports the Board's conclusion that the kiln operators and maintenance personnel took reasonable precautions to prevent equipment damage. The employees' uncontradicted testimony indicates that one person should have been able to control the kiln's cooling process to prevent damage. The kiln operators consulted their supervisor, Carl Hardin, and followed his directions in preparation for the work stoppage. The record indicates that Hardin directed the kiln shutdown and then permitted the striking employees to leave their work stations. That the kiln employees consulted their supervisor and followed his directions to shut down the kiln clearly distinguishes the instant case from *NLRB v. Reynolds & Manley Lumber Co., Inc.*, 212 F.2d 155, 158–63 (5th Cir.1954) (holding employee lawfully discharged for leaving a potentially explosive boiler unattended without even contacting relief or a supervisor).

We also find that substantial evidence supports the Board's determination that the other discharged plant employees took reasonable precautions by turning off most of their equipment before leaving. Tyo was discharged because Columbia believed that the conveyor belts could have burned up due to the accumulation of clinker, marble-sized balls of unrefined cement, at the end of the kiln line. Columbia's concern was unfounded for two reasons: (1) the configuration of the conveyor belts and storage piles guards against such accumulation; and (2) the shutdown of the kiln halted clinker production. Columbia claims that the materials in the mills that Corbett and Stoneburner were operating could have

clogged the machinery or made restarting them difficult. Employees, however, routinely turned off the mills' pumps at the end of their shift. A greater risk of danger would have resulted from Corbett, Stoneburner and Tyo leaving their milling equipment or crane operating unattended. Moreover, Columbia's supervisory personnel restarted the equipment approximately six hours after the employees shut down the mills and tanks. The supervisory personnel did not observe any problems in the tanks or pumps subsequent to their restart. The Board properly determined that the employees, in the exercise of their statutory right to strike, took reasonable precautions to prevent imminent danger to Columbia's facility. We, therefore, enforce the Board's order to reinstate and make whole the unlawfully discharged plant employees.

### C.

■ Columbia also contends that the Board erred in finding that Columbia unlawfully discharged Wartenbe for strike misconduct. The Board argues that Columbia failed to establish a good faith belief that Wartenbe attacked James Jackson ("Jackson"), a nonstriking employee, with a baseball bat. As Columbia's argument is persuasive, we find error in the Board's determination that Wartenbe was unlawfully discharged.

Wartenbe's July 3, 1985 attack on Jackson was corroborated by a police report filed that day with the Zanesville Police Department. The police report named the parties involved in the dispute, the location of the dispute and the manner in which Wartenbe attacked Jackson. Wartenbe, who is currently serving a prison sentence for another crime, and Jackson, who is no longer employed by Columbia, were unavailable to testify at the administrative hearings. The Board contends that Columbia's failure to indicate when it obtained the police report negates its good faith belief at the relevant time.

We, however, conclude that the police report alone provides substantial evidence

of Columbia's good faith belief. Finding the Board's determination regarding Wartenbe's discharge unsupported by substantial evidence, we reverse the Board's finding that Columbia unlawfully discharged Wartenbe. Wartenbe's back pay, therefore, should be discontinued as of July 8, 1985, the day Columbia notified him that he would be discharged because of the assault on Jackson.

### D.

In its final argument, Columbia contends that the Board erred in finding that the June 18, 1985 strike was an unfair labor practice strike and, therefore, covered by the NLRA. The Board responds, and we agree, that substantial evidence supports its determination.

A strike is an unfair labor practice strike if unfair labor practices are a "contributing cause" of the strike. *Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 820 (6th Cir. 1975). The nature of a strike is a factual issue on which the Board's findings are conclusive if supported by substantial evidence on the record as a whole. *See Harding Glass Industries, Inc. v. NLRB*, 672 F.2d 1330, 1338 (10th Cir.1982).

The NLRA does not protect harassing techniques, such as intermittent or recurrent work stoppages "which are neither work nor strike." *NLRB v. Robertson Industries*, 560 F.2d 396, 398 (9th Cir.1976). The NLRA has been interpreted to prohibit employees from both drawing wages and attempting to put economic pressure on the employer at the same time. *See Roseville Dodge, Inc. v. NLRB*, 882 F.2d 1355, 1359 (8th Cir.1989). Multiple strikes, however, are not *per se* prohibited. *See, e.g., NLRB v. Empire Gas, Inc.*, 566 F.2d 681, 686 (10th Cir.1977); *Robertson Industries*, 560 F.2d at 399 (9th Cir.1976); *Crenlo, Div. of GF Business Equip., Inc. v. NLRB*, 529 F.2d 201, 204 (8th Cir.1975).

We find that there is substantial evidence in the record to support the Board's finding that the June 18, 1985 strike was protected by the NLRA. Columbia fails to present any evidence supporting its contention that the strikes were intermittent work stoppages motivated by the employees' attempt to simultaneously draw wages and subject Columbia to economic pressure. Moreover, there is substantial evidence that Columbia's failure to remedy the unfair labor practices was a "contributing cause" of the June 18, 1985 strike. On June 17, 1985, the employees met with an international union representative, August Clavier, and discussed: unilateral, retroactive changes in the grievance procedure; the denial of the employees' right to union representation at investigatory interviews; the refusal to allow anyone other than active employees to represent them at grievance proceedings; and the discharge of employees for alleged strike misconduct. The international union representative belatedly informed the employees that the international union supported their decision to strike. Dissatisfied with their previous decision to return to work, the employees voted to resume the strike the next day. Without an express term waiving the employees' right to strike, Columbia's offer to reinstate most of the employees, which they accepted, failed to preclude the June 18 strike. *See Kellogg Co. v. NLRB*, 457 F.2d 519, 525 (6th Cir.) (relinquishment of right to strike must be expressed in "clear unmistakable language"), *cert. denied*, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972).

### III.

For the foregoing reasons, we AFFIRM the Board's determination that the May 8, 1985 and June 18, 1985 strikes were unfair labor practice strikes. We REVERSE the Board's determination that Columbia unlawfully discharged Wartenbe and ENFORCE the Board's order to reinstate and make whole the unlawfully discharged employees.