**CALEX CORPORATION,**
**Petitioner/Cross–**
**Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent/Cross–**
**Petitioner.**

Nos. 97–5341, 97–5434.

United States Court of Appeals,
Sixth Circuit.

Submitted March 13, 1998.

Decided May 11, 1998.

Richard N. Selby (briefed), Christopher J. Newman, Henderson, Covington, Messenger, Newman & Thomas Co., Youngstown, Ohio, for Petitioner/Cross–Respondent.

David Habenstreit (briefed), National Labor Relations Board, Office of the General Counsel, Aileen A. Armstrong, Deputy Assoc. Gen. Counsel (briefed), Rachel Gartner (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Before: KEITH, SUHRHEINRICH, and DAUGHTREY, Circuit Judges.

KEITH, Circuit Judge.

## OPINION

Petitioner, Calex Corporation ("Company"), seeks review of an order of the National Labor Relations Board ("Board") finding the Company to have violated §§ 8(a)(5) and 8(a)(1) of the National Labor Relations Act ("Act") for failing and refusing to bargain with a certified Union. The Board filed a cross-application for enforcement of its order. We **Deny** the Company's petition for review and **Grant** the Board's cross-application for enforcement.

### I.

The Company manufactures aluminum products at a facility in Campbell, Ohio. On November 29, 1994, the Board certified the United Steel Workers of America AFL–CIO, CLC ("Union") as the exclusive collective-bargaining representative of the Company's 110 to 115 production and maintenance employees, following the Union's victory in a Board-conducted secret ballot election.

Immediately following the certification, Union representative, Gatewood contacted Company owner, Arora and requested that the parties begin bargaining for an initial contract in January. On December 13, 1994, Alan Fry, a labor consultant, retained by the Company, responded to Gatewood's request in a letter in which Fry stated that he would only be available to meet for one day in January, and asked that Gatewood select one of six listed dates. Within a day or two of receiving Fry's letter, Gatewood chose the latest day offered, January 27, 1995.

Early in January, Gatewood wrote to Fry advising him that it was the Union's policy that initial contracts be in place ninety days

after the employees elect Union status. Gatewood also enclosed a copy of the Union's proposed initial contract.

A few days prior to the scheduled January 27, 1995 meeting, Company negotiator Fry telephoned Gatewood, informing him that the Company's representative, who had planned to attend the bargaining sessions, had just announced plans to retire. Fry stated that, because Company owner Arora was out of the country, he did not know whom the Company would select as a replacement for the negotiations. Accordingly, the meeting scheduled for January 27 was postponed to February 2, to allow for Arora's return. Prior to February 2, Gatewood was informed that because Arora was still out of town, the meeting needed to be postponed until February 8.

The first negotiating session was held on February 8, 1995. At this meeting, Gatewood wanted to schedule three or four meetings per week and Fry was only willing to meet one or two days per month. The parties agreed on March 8, 1995 as the next meeting date.

On February 13, Gatewood wrote to Fry to confirm the March 8 date and to express his concern regarding the length of time between negotiating sessions. Gatewood reiterated the Union's policy of securing contracts within 90 days of certification and requested that the parties meet for several consecutive days in March.

By February 28, Gatewood had received no response to his request for additional meetings and therefore, sent a letter to unit members updating them on the status of the negotiations. On March 6, Fry sent his response to Gatewood's February 13 letter. In his letter, Fry confirmed the March meeting date, but did not address Gatewood's request to meet on consecutive days.

Fifteen minutes after the March 8 meeting was scheduled to begin, Gatewood received a telephone call from Plant Manager Brace, who informed them that Fry could not attend the meeting. Brace reported that, due to inclement weather, Fry was unable to fly his private plane from his home in Cincinnati to the meeting site in Youngstown. Brace stated that Fry would contact Gatewood to reschedule the meeting.

Fry contends that he called the Union offices later that day to reschedule the meeting, but because no one answered the phone, he left a message on the answering machine requesting that Gatewood call back. Gatewood claims to have never received this message and in any event failed to contact Fry.

Following the cancellation, the Union held a meeting to discuss the lack of progress in the negotiations. After Gatewood gave an overview of the negotiations to date, Union District Director Dan Martin told the members that the Union was having trouble getting the Company to schedule meetings and that he did not feel that the Company was bargaining in good faith. The Company contends that Gatewood told Martin that it was Fry who suggested that the parties not meet until after the holidays, when in actuality, it was Gatewood who requested that negotiations commence after the holidays. At the conclusion of the meeting, the unit members voted to authorize the Union's officers to call a strike if they were not satisfied with the progress of the negotiations.

The next negotiation meeting, originally scheduled as a full-day session to be held on March 28, was canceled and rescheduled for March 27, at Fry's request. As a result, the parties were only able to meet for half of the day on March 27. At that meeting, Gatewood reiterated his concerns that the parties were not meeting frequently enough to reach an agreement in a reasonable amount of time, and suggested that the parties hold three or four sessions over the period of March 31 to April 4. Fry responded that he would not be available on those dates. Gatewood then requested to meet as many as ten days in April, but Fry refused, asserting that he would also be unavailable from April 4 to April 16, and that he was "only going to meet one day in April." The parties ultimately agreed to meet on April 25.

Following the March 27 meeting, Gatewood sent Fry several letters requesting that the Company provide another negotiator in order to facilitate the bargaining process. In response, Fry rejected both Gatewood's request for additional meeting and his request for another negotiator.

The parties held their third bargaining session on April 25. During the meeting, Gatewood again asked the Company to schedule additional bargaining sessions. Fry replied that he would meet only on five specific dates over the next three months—May 17, June 7 and 22, and July 6 and 27. Fry claimed that he wanted more time to study proposals and that he required 3 to 4 week intervals between meetings due to "commitments to other clients."

Following the April 25 meeting, Gatewood met with the other members of the Union's negotiating team to discuss the "lack of bargaining" taking place. The negotiating team decided to call a strike commencing on May 1, based upon the "company's failure to meet on a more frequent basis."

In a letter to Fry dated May 2, Gatewood expressed his dissatisfaction with the existing schedule of meetings and with Fry's unwillingness to meet more frequently. Explaining that the strike was a direct result of the Company's unwillingness to schedule additional meetings, Gatewood requested that the Company retain another negotiator if Fry was personally unable to meet more frequently, and that the parties meet ten days per month for the following three months to facilitate reaching an agreement.

On May 3, Fry telephoned Gatewood to discuss the strike. During that conversation, Gatewood again asked for additional meeting dates in May. In response, Fry offered to resume negotiations on Friday, May 12, 1995, and to continue meeting every other week for at least three months, if the Union ended the strike immediately.

Two days after his telephone conversation with Fry, Gatewood sent an update to the bargaining unit employees, informing them that despite Gatewood's efforts to schedule additional meetings, the Company had only offered to meet two times per month. Gatewood stated that because the Company was "not serious yet" about the negotiation, the strike would continue.

At the parties' fourth bargaining session, on May 17, Gatewood asked for additional sessions in June, but the Company adhered to its offer to meet only on June 7 and 22. The Union then offered to end the strike if the Company would agree to meet six times

a month and subsequently put that offer in writing. Fry responded to the offer to end the strike in a letter dated May 25, in which he rejected the Union's offer to end the strike and reiterated the Company's willingness to meet only on the previously scheduled dates in June and July.

On June 7, the parties held their fifth bargaining session. Five days later, they attended a meeting convened by the Mahoning Valley Labor Management Citizens Committee in an attempt to seek a resolution to the dispute over the frequency of meetings and to end the strike. This meeting did not successfully end the strike.

The parties held their sixth and seventh negotiating sessions on June 22 and July 6, respectively. The parties spent some of the June 22 meeting negotiating for a contract. A portion of that meeting, as well as the entire July 6 session, were spent attempting to reach a strike settlement agreement. Those efforts proved unsuccessful.

The parties agreed to cancel the previously scheduled July 27 meeting and to suspend negotiations because Plant Manager Brace had to undergo surgery and needed time to recuperate. During that time, Gatewood fell ill, and was replaced by Union representative Gary Steinbeck prior to the next scheduled session on September 8. The Company claims that Steinbeck's replacement of Gatewood significantly slowed progress towards a new contract because Steinbeck was not informed about prior negotiations.

At the September 8 meeting, Steinbeck asked Fry to schedule as many dates as possible so that the parties could reach an agreement. Fry rejected that request, refusing to meet more than twice per month. When Steinbeck protested, Fry stated that he could "beat the unfair labor practice charge by meeting only once a month."

When Steinbeck and the Union's negotiating committee arrived for the next scheduled meeting on September 25, they were informed that the Company had canceled the session because of a problem with Fry's airplane. During a conversation later that day, in which Steinbeck and Fry rescheduled the meeting, Steinbeck also attempted to sched-

ule additional meeting dates. Fry refused to schedule additional dates, but indicated that he would raise the issue with company owner Arora.

The next scheduled meeting on October 6, was also canceled, because Fry tore his achilles tendon. On October 6, the Board's Regional Director issued the complaint in this case, alleging that the Company had failed to bargain with the Union in good faith. Five days later, the parties held their ninth bargaining session. At the meeting, Steinbeck again asked Fry to schedule additional meeting dates. In response, Fry indicated that he was willing to meet three times per month.

The parties' tenth and eleventh meeting occurred on October 23 and 24. At the October 24 meeting, additional meetings were scheduled for November 9 and 16. When the Union representatives arrived on each of those dates, they learned that the Company had called to cancel the sessions. On November 9, a Company representative called to report that Fry would not be able to attend the scheduled session because the "alternator was failing on his vehicle." On November 16, Plant Manager Brace called to report that Fry had contacted him the previous evening and had stated that he "wouldn't be able to fly in because of the bad snowy conditions."

The parties next met on November 20, and then met for three consecutive days, from November 27 through November 29. At both the November 20 and 29 meetings, the Union requested multiple dates in December, but the Company would only agree to two, December 8 and 14.

On December 6, Fry canceled the December 8 meeting, stating that he would not have use of his airplane that week because of maintenance. Fry suggested that the parties meet on December 14 and 15. On both the 14th and 15th, Steinbeck asked Fry for additional meeting dates in December, but Fry refused to schedule additional dates for that month. In addition, Fry refused to schedule meeting dates for January until the conclusion of the hearing in the instant unfair labor practice case, which was scheduled to begin on January 12, 1996. After further requests by Steinbeck, Fry agreed to meet on January 11 and 23, 1996. Fry subsequently canceled the January 11 session, stating that "the bad weather" prevented him from flying to the meeting.

On Friday, January 19, 1996, Fry called Steinbeck to cancel the meeting scheduled for Monday, January 23, citing the bad weather predicted for that day. In response, Steinbeck argued that the meeting should not be canceled because they could not predict the actual weather conditions on that day. Fry eventually relented, and the parties agreed to hold the originally scheduled January 23 meeting, as well as an additional meeting on January 22.

At the January 23 meeting, Steinbeck raised the issue of scheduling meetings for the month of February. Fry stated that he would not agree to more than three days in February because Company owner Arora would only agree to have him meet three days per month.

Based on the foregoing facts, the Board found, in agreement with the administrative law judge, that the Company violated Section 8(a)(5) and (1) of the Act by failing and refusing to meet with the Union at reasonable times for the purpose of collective bargaining. The Board also found, in agreement with the administrative law judge, that the strike by the Company's unit employees, which commenced on May 1, 1995, was caused and prolonged by the Company's unfair labor practices, and was, therefore, an unfair labor practice strike.

The Board's order requires the Company to cease and desist from the unfair labor practices found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of rights guaranteed by Section 7 of the Act. Affirmatively, the order directs the Company, on request, to bargain in good faith with the Union as the exclusive representative of the bargaining unit employees, and specifies that the Company's bargaining obligations include compliance with the Union's request for more frequent bargaining sessions. In addition, the order directs the Company to offer strikers, on their unconditional application to return to work, immediate and full reinstatement to their former positions, or, if

those positions no longer exist, to substantially equivalent positions.˙ The order also extends the certification year for an additional ten months from the commencement of good faith bargaining with the Union, and requires the Company to post and mail to striking employees copies of an appropriate remedial notice.

## II.

■ This Court will enforce an order of the National Labor Relations Board if substantial evidence supports its findings. 29 U.S.C. § 160(e); *NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir.1993). In determining whether the evidence is substantial, the reviewing court must consider all of the facts, but may not substitute its judgment between two conflicting views, even though it might have decided the matter differently if it were a case of first impression. *YHA Inc. v. NLRB,* 2 F.3d 168, 172 (6th Cir.1993). However, while a reviewing court must not re-decide matters of credibility, it must not merely act as a rubber stamp for the administrative agency on appeal. *Id.*

Section 8(a)(5) of the National Labor Relations Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158(a)(5). Section 8(d) of the Act defines the duty to bargain collectively as the mutual obligation of the employer and Union "to meet at reasonable times to confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement...." 29 U.S.C. § 158(d).

■ In order to determine whether the parties have conferred in good faith, this Court must examine the overall conduct of the parties, and draw any necessary inferences. *NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). Dilatory and delaying tactics that undermine the process of collective bargaining are indicative of bad faith bargaining. *See Kobell v. Paperworkers,* 965 F.2d 1401, 1408 (6th Cir.1992); *see also Radisson Plaza Minneapolis v. NLRB,* 987 F.2d 1376, 1382 (8th Cir.1993); *A.H. Belo Corp. v. NLRB,* 411 F.2d 959, 968 (5th Cir.1969).

## III.

■ In the case at bar, the Board found that the Company's actions amounted to a "pattern of purposeful delay ... employed ... to thwart the bargaining process," and thus found that Calex violated its duty to bargain under Section 8(a)(5) and (1) of the Act by failing and refusing to meet at reasonable times. In particular, the Board "relied not only on the fact that the parties held only 19 bargaining sessions in the 15 months following the Unions's certification in November 1994, but also on the number of scheduled meetings which the [Company] canceled, the [Company's] arbitrary decision to limit the number of meetings to one a month prior to the strike that commenced May 1, 1995, the [Company's] repeated refusal of the Union's requests for more frequent meetings, and certain statements· which the [Company's] negotiator made during the course of bargaining." The Administrative Law Judge found and the Board agrees that the Company's conduct evidenced a "pattern of delay" in negotiating which was clearly evident prior to the strike and continued thereafter. For the reasons set forth below, we find that there is substantial evidence to support the Board's determination.

First, the evidence shows that on several occasions the Company refused the Union's requests to meet more frequently with the Union negotiators. At the first bargaining session, Gatewood requested that both sides meet three to four times per month. Fry voiced his opposition to this suggestion and reasoned that his commitments to other clients would only allow him to meet one or two days per month. From that point on, Gatewood and his successor Steinbeck continued to express their dissatisfaction with the infrequent meetings and continued to insist that more sessions be held. As a consequence of Fry's refusal to meet more often, the parties held only one bargaining session during the first four months of negotiations. They subsequently met five times over the next four months. The issuance of the unfair labor practice complaint of October 6, 1995 spurred the parties to meet more often. Even then, however, the Company ignored the Union's requests for more hear-

ings, with the result being that the parties met only three times in October, four times in November and two times during each of the months of December and January.

■ The Company claims that the Board erred by finding that Calex violated its duty to meet at reasonable times because the Board could not show that the Company's proffered reason of having commitments to other clients was false. The Board correctly stated that "an employer's chosen negotiator is its agent for the purposes of collective bargaining, and that if the negotiator causes delays in the negotiating process, the employer must bear the consequences." "There remains on the employer the positive legal duty to meet and confer with the Union at reasonable times and intervals." *NLRB v. Exchange Parts Co.*, 339 F.2d 829, 832–33 (5th Cir.1965); *see also NLRB v. Milgo Indus., Inc.*, 567 F.2d 540, 544 n. 6 (2d Cir. 1977) ("A lawyer's busy schedule is not an acceptable excuse for a failure to meet at reasonable times and bargain collectively."). Thus, whether Fry's commitment to other clients permitted him to meet more often with the Union is irrelevant because Calex had an affirmative obligation to meet and confer with the Union at reasonable times.

Moreover, the evidence supports the Board's conclusion and contradicts Fry's claim. The judge found that Company owner Arora initially limited the number of meetings. Testimony revealed that Fry told Steinbeck, that he would not agree to more than three meetings per month because Arora would only allow him to meet three days per month. The evidence also shows that following the strike, Fry was able to meet every other week, in exchange for an end to the strike, and was able to accelerate the schedule even further after the unfair labor practice complaint was issued. Therefore, substantial evidence supports the Board's finding that when outside circumstances, such as the strike, placed pressure on Calex to meet more frequently, Fry's schedule became more flexible, even though he still had commitments to other clients.

The evidence also shows that the Company also manifested its bad faith by repeatedly canceling scheduled meetings. *See Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376 (8th Cir.1993). The Company commenced the negotiations by canceling its first two meetings scheduled for January 27 and February 2. Eventually, Calex canceled a total of seven meetings, resulting in lengthy breaks between sessions. For example, because the Company canceled the meeting scheduled for March 8, nearly two months elapsed between the parties' first negotiating session on February 8 and their second session, finally held on March 27. Again, the Company claims that the meetings were necessarily canceled for legitimate reasons. However, the intent behind the cancellations does not negate the Company's duty to bargain. The Company was still required to meet at reasonable times and bargain collectively with the Union. *NLRB v. Exchange Parts Co.*, at 833. The Company's refusal to schedule more frequent meetings combined with the pattern of canceled meetings caused long lapses between negotiation sessions and established a pattern of delay.

■ The Company asserts that the decisions of the Board and the administrative law judge reflect "bias". This assertion is without merit. It is well-established that, in order to establish judicial bias, there must be evidence of an extrajudicial source of bias or a deep-seated antagonism to the complaining party. *See Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 1158, 127 L.Ed.2d 474 (1994); *Colfor Inc. v. NLRB*, 838 F.2d 164, 165 (6th Cir.1988). The Company's allegation of bias does not claim that the administrative law judge or the Board based their decision on anything other than the evidence contained in the record, thus, the Company's accusation is without merit.

Equally unpersuasive is the Company's argument that its pattern of delay was excused by Union representative Steinbeck's alleged unpreparedness to assume Gatewood's role. By the time Steinbeck entered the picture, Calex had already established a pattern of delay over the prior seven month period. Moreover, Calex's duty to meet at reasonable times was not diminished with the appearance of a new Union negotiator. *A.H. Belo Corp. v. NLRB*, 411 F.2d 959, 968 (5th Cir. 1969).

Looking at the overall conduct of the parties, there is substantial evidence to support

the Board's finding that Calex violated Sections 8(a)(1) and (5) of the Act.

## IV.

A strike is an unfair labor practice strike if it is "caused in whole or in part by an employer's unfair labor practices...." *Columbia Portland Cement Co. v. NLRB,* 979 F.2d 460, 463 (6th Cir.1992) (citation omitted). In addition, a strike that did not begin as an unfair labor practice strike can be converted to an unfair labor practice strike if an unfair labor practice serves to prolong the strike. *Walker Die Casting, Inc. v. NLRB,* 682 F.2d 592 (6th Cir.1982).

For the reasons identified below, we find that substantial evidence supports the Board's finding that the Union's strike was a result of the Company's refusal to set up meetings to bargain, and as such was an unfair labor practice strike.

First, the main topic at the March 18 unit meeting, at which the employees authorized the strike, was the Company's demonstrated refusal to schedule frequent bargaining sessions. Prior to that meeting, Company negotiator Fry had informed the Union that he would only meet once or twice per month, had refused to hold the parties' second meeting earlier than March 8, and had canceled the March 8, meeting. In response, Union District Director Dan Martin asked the Union members to authorize the Union negotiators to call a strike for the purpose of persuading the Company to set up more meetings.

Second, during the period between March 18 and the commencement of the strike on May 1, the Company continued to refuse to meet more frequently and canceled a meeting that was scheduled. At the April meeting the Company agreed to meet only once in May, but prior to the strike, the Company canceled this meeting. During the six weeks following the March 18 Union meeting, the Union made several requests to the Company to schedule additional bargaining sessions. The Company refused each of these requests.

In response to the Company's steadfast refusal to schedule meetings, the Union negotiating team decided to call strike, which commenced on May 1.

Third, efforts to cease the strike focused exclusively on the issue of the frequency of bargaining sessions. In correspondence sent immediately after the strike commenced, Fry and Gatewood exchanged offers to end the strike, both of which centered on the number of bargaining schedules.[1] Similarly, the Mahoning Valley Labor Management Citizens Committee's effort to settle the strike centered on the issue of the frequency or the bargaining sessions. There is no evidence to suggest that any topic other than the scheduling of bargaining sessions was ever discussed in attempts to settle the strike.

Unpersuasive is the Company's assertion that the strike vote was tainted because Union representative Gatewood in a letter dated February 28 erroneously stated that the Company was responsible for negotiation delays in January. The Board reasonably determined that this letter was immaterial because "it was the [company's] refusal to meet more than once a month prior to the strike, and not the initial delay in bargaining, which caused the strike."

The record provides substantial evidence to support the Board's determination that the Union's strike was an unfair labor practices strike.

## V.

For all of the foregoing reasons, the Company's petition for review is denied and the Board's cross-application for enforcement is granted.

---

1. Contrary to the Company's assertion, the record does not establish that the Union required that the parties meet ten times per month to end the strike. Rather, Gatewood indicated that the Company could have avoided the strike "[b]y agreeing to meet more often ..." and that there were "a couple of different proposals on the table" through which the Company could have avoided the strike.