The **WILKIE COMPANY,**
**Petitioner/Cross–**
**Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent/Cross–**
**Petitioner.**

Nos. 01–1793, 01–2019.

United States Court of Appeals,
Sixth Circuit.

Jan. 29, 2003.

ON PETITION FOR REVIEW AND CROSS APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before MERRITT and DAUGHTREY, Circuit Judges, and RUSSELL,* District Judge.

PER CURIAM.

Pinnacle Metal Products, Inc., formerly known as The Wilkie Company d/b/a Wilk-

ie Metal Products, Inc., petitions for review of an order of the National Labor Relations Board. The Board seeks enforcement of the same order, in which it affirmed the ruling of an administrative law judge that the company had engaged in certain unfair labor practices in violation of the National Labor Relations Act. For the reasons discussed below, we conclude that the record supports the findings of the ALJ, and we therefore order enforcement of the Board's order.

### FACTUAL AND PROCEDURAL BACKGROUND

At the time of the incidents in question here, The Wilkie Company was a metal stamping facility located in Muskegon, Michigan. The company's approximately 48 employees were represented by the International Association of Machinists and Aerospace Workers, Local 670, AFL–CIO. The company was purchased by John Roberts Boos, Sr., in 1993, and his son, John Roberts Boos, Jr., was the manufacturing manager for the plant. When Boos Sr. purchased the plant, he assumed the then-existing collective bargaining agreement. Before that agreement expired in 1994, a three-year successor agreement was negotiated. That agreement was extended by the parties without modification for one year, until February 1, 1998. When the parties could not negotiate a new collective bargaining agreement before February 1, 1998, the company employees went on strike.

The union filed charges from October 1997 to June 1998, based on a number of incidents of alleged unfair labor practices by the company in the months leading up to and during the strike. The charges

* The Hon. Thomas B. Russell. United States District Judge for the Western District of Kentucky, sitting by designation.

included the following alleged unfair labor practices that form the basis for this appeal: (1) Boos Jr.'s treatment of union bargaining representative Jeff Pugh in transferring him to the second shift in spite of his contractual seniority right to remain on the first shift, reducing his pay, assigning him more onerous work, and refusing to grant him an excused absence as a union official for union business; (2) Boos Jr.'s statements to employee Karen Walker that he did not like her going to the union and making complaints about working conditions; (3) Vice–President Robert Darga's statements to Pugh, his brother and co-worker James Pugh, and employee David Bates that Pugh was transferred because he filed charges with the Board; (4) Boos Sr.'s statements to employees Bernard Robart, David Bates, Karen Bates, and Robert Dollaway about the potential strike and possible reprisals for striking; (5) shift supervisor Mitch Piasecki's statements to employees Rhonda Boltze and Shelli Moran threatening them with discharge if they engaged in a strike; (6) Boos Jr.'s conduct destroying picket signs and other union property and assaulting a picket by spitting in her face when she complained about the destruction; (7) Boos Jr.'s conduct confiscating two lawful picket signs and threatening pickets with physical violence for continued picketing activity. The ALJ also had to determine whether the strike was an economic strike or a unfair labor practice strike.

Following an evidentiary hearing, the ALJ issued a decision finding merit in some charges and dismissing others. After the company filed exceptions to the ALJ's conclusions, the Board issued its order finding that the company violated Section 8(a)(1), (3), (4), and (5) of the NLRA, 29 U.S.C. § 158(a)(1), (3), (4), and (5). The company then filed a petition for review of the Board's order, and the Board responded with a cross-petition seeking enforcement. The company now requests review of only two issues: whether Boos Sr.'s and Piasecki's statements to six employees about the potential strike and possible reprisals for striking were unlawful and whether the strike in question was an "unfair labor practice strike" as opposed to an "economic strike." The company does not challenge any other findings of unfair labor practices in its petition. The Board seeks summary enforcement of the uncontested findings in its decision, and it argues we should also enforce the contested findings regarding Boos Sr.'s and Piasecki's statements and the nature of the strike on the ground that they are supported by substantial evidence.

## DISCUSSION

### A. Summary Enforcement of Uncontested Findings

■ Because the company does not contest a number of the Board's findings, the Board is entitled to summary enforcement of its findings on these matters under well-settled circuit precedents. *See, e.g., Beverly Health and Rehabilitation Serv., Inc. v. NLRB*, 297 F.3d 468, 483 (6th Cir.2002); *NLRB v. Tri–State Warehouse & Distrib., Inc.*, 677 F.2d 31, 32 (6th Cir.1982). An employer's failure to "address or take issue with the Board's findings and conclusions with regard to [violations of the Act] effectively results in abandonment of the right to object to those determinations." *NLRB v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1241 (6th Cir.1996). The employer is considered to have "effectively admitted the truth of those findings," allowing the reviewing court to summarily enforce the NLRB order with regard to those issues. *Id.; See also NLRB v. Autodie Int'l, Inc.*, 169 F.3d 378, 381 (6th Cir. 1999). We therefore grant summary enforcement of the following uncontested

findings of the Board. First, the company violated Section 8(a)(3) and (1) by reassigning Pugh to the second shift, reducing his pay, assigning him to more onerous work, and refusing to excuse his absence as a union official for union business, all because of his union activity. Second, the company violated Section 8(a)(4) and (1) by reducing Pugh's pay, assigning him to more onerous work, and refusing to grant him an excused absence as a union official for union business because he had filed charges with the NLRB. Third, the company violated Section 8(a)(5) and (1) by failing to permit Pugh to exercise his contractual seniority rights to remain on the first shift, to decline an assignment to more onerous work, and to take an excused absence as a union official for union business, without bargaining with the union. Fourth, the company violated Section 8(a)(1) by telling employee Workman not to go to the union with her complaints about working conditions. Fifth, the company violated Section 8(a)(1) by Vice President Darga's statements to Pugh, James Pugh, and David Bates that Pugh had been reassigned because of the NLRB charges. Sixth, the company violated Section 8(a)(1) by assaulting a striking employee, threatening strikers with physical violence, and destroying their property.

## B. Substantial Evidence Review of Contested Findings

We review the Board's findings of fact and its application of law to the facts to determine whether they are supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(e), (f). "Substantial evidence consists of such relevant evidence that a 'reasonable mind might accept as adequate to support a conclusion.'" *Kentucky Gen., Inc. v. NLRB*, 177 F.3d 430, 435 (6th Cir.1999) (quoting *NLRB v. General Sec. Servs. Corp.*, 162 F.3d 437, 441 (6th Cir.1998)). Even if we might have reached a different conclusion upon *de novo* review, we must nevertheless sustain those findings as long as the record as a whole contains substantial evidence to support them. *See ITT Auto. v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999); *Kentucky Gen.*, 177 F.3d at 435. In reviewing the findings, we must also determine whether the Board considered contradictory evidence and evidence that suggests conflicting inferences. *See Heritage Broad. Co. of Michigan v. NLRB*, 308 F.3d 656, 659 (6th Cir.2002).

## A. Coercive Statements by Boos and Piasecki

■ An employer violates Section 8(a)(1) of the NLRA by threatening employees with reprisals or discharge for engaging in protected activity, including a strike. *See NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105–06 (6th Cir. 1987). An employer also violates Section 8(a)(1) by interrogating employees about their union sympathies or the union sympathies of their co-workers. *See Dayton Typographical Serv., Inc. v. NLRB*, 778 F.2d 1188, 1194–95 (6th Cir.1985). In determining whether there was a violation, the total context in which the challenged conduct occurs is relevant, and the determination must be made from the perspective of the impact on the employees. *See Okun Bros. Shoe Store, Inc.*, 825 F.2d at 105.

The six alleged incidents of coercive statements arose in the following order. Just before Christmas 1997, Boos Sr. approached Robart and snidely asked him, "[D]o you have your money saved up for the strike?" Robart responded, "I hope it really don't [sic] come to that." Then Boos Sr. said, "Well, two or three guys in the shop ... are going to cause you guys to go on strike." and added that he was "sick and tired of all the grievances" and

"just was tired of the people that were filing the grievances." The ALJ found Robart's testimony credible and Boos Sr.'s denial that the conversation occurred not credible.

Around the first week in January 1998, Boos Sr. spoke with David Bates and asked him if he was prepared for the strike. David Bates responded that he hoped there would not be a strike, and Boos replied, "I hope there isn't also because if you guys do go out on strike, you will not be coming back [and it will get] very ugly." The ALJ found David Bates's testimony credible and Boos Sr.'s denial that the conversation occurred not credible.

Later that month, Boos Sr. engaged Karen Bates in a conversation about the union and her work. The conversation ended when Boos said to Karen Bates, "[G]ood luck with your new career." Karen Bates was not planning any changes in her career. The ALJ found Karen Bates' testimony credible and Boos Sr.'s denial that he made the remark not credible.

About the same time. Piasecki approached Moran, who was at the coffee machine speaking with fellow employee Boltze about Moran's father's union, and he told them that their union did not "amount to crap." He further said, "I'll tell you right now, as a matter of fact, that if you guys go on strike, you won't be getting your job back. And the drill department will be the first to go." The ALJ found Moran's testimony credible and Piesecki's denial that he had made these comments not credible.

On January 30, 1998, Boos Sr. approached Dollaway and conversed with him about the negotiations. When Dollaway said that he hoped there would not be a strike, Boos replied, "I hope you don't either, because it will be pretty ugly if you do." Boos then turned and walked away.

The ALJ found Dollaway credible and Boos Sr.'s denial of the incident not credible.

Sometime near the end of January, Piasecki approached Boltze in the lunchroom and told her not to tell anyone, but that Boos had told him that "if we go on strike, none of us will be coming back." The ALJ found Boltze's testimony credible and Piesecki's denial of this remark not credible.

Our review of the record convinces us that, based on the ALJ's credibility determinations, there is more than merely substantial evidence—indeed, there is ample evidence—to support the Board's conclusion that the company violated Section 8(a)(1) by telling multiple employees they would lose their job or suffer retaliation if they went on strike. The Board's decision that Boos Sr.'s remarks to Robart, David Bates, Karen Bates, and Dollaway constituted an attempt to intimidate the employees into voting against a strike by threatening discharge and other reprisals was entirely reasonable, given the context in which the conduct occurred. Likewise, the Board's decision that Piasecki's remarks to Rhonda Boltze and Shelly Moran implicitly threatened the employees with discharge if they went on strike was reasonable, given the context of the conduct.

■ As noted above, the conclusions that the company violated Section 8(a)(1) rested on credibility determinations, and the company has provided this court with no basis upon which to overturn those credibility determinations of the ALJ. We, of course, must uphold an ALJ's credibility determinations that have been affirmed by the NLRB unless they lack a rational basis. *See Health Care and Ret. Corp. of Am. v. NLRB*, 255 F.3d 276, 282 (6th Cir.2000). Although much of the testimony of the six employees was uncorroborated because they were alone with Boos

or Piasecki when the comments were made, the testimony consistently demonstrated the company's pattern of threats and intimidation designed to coerce union members not to strike. Moreover, the record demonstrates clearly that the statements were not protected under Section 8(c) of the Act, because that provision protects only non-threatening predictions of job loss that are carefully phrased and objectively based on consequences beyond the employers control. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Communication involving threats of retaliation or reprisal intended to coerce employees is not protected by the First Amendment. *See id.*

Based on the substantial evidence standard, we conclude that the six encounters outlined above were coercive and violated Section 8(a)(1) of the NLRA.

## B. Unfair Labor Practice Strike

As we held in *Calex Corp. v. NLRB*, 144 F.3d 904, 911 (6th Cir.1998):

> A strike is an unfair labor practice strike if it is "caused in whole or in part by an employer's unfair labor practices...." *Columbia Portland Cement Co. v. NLRB*, 979 F.2d 460, 463 (6th Cir.1992) (citation omitted) In addition, a strike that did not begin as an unfair labor practice strike can be converted to an unfair labor practice strike if an unfair labor practice serves to prolong the strike. *Walker Die Casting, Inc. v. NLRB*, 682 F.2d 592 (6th Cir.1982).

The determination that a strike is an unfair labor practice strike is a factual issue on which the Board's findings are conclusive if supported by substantial evidence on the record as a whole. *See Columbia Portland Cement Co. v. NLRB*, 915 F.2d 253, 259 (6th Cir.1990). This determination is an important one because employees who engage in an unfair labor practice strike may not be permanently replaced by other employees, but rather are entitled to immediate reinstatement by the employer upon their unconditional offer to return to work. *See Columbia Portland Cement Co.*, 979 F.2d at 463.

■ In this case, a number of employees testified before the ALJ that the union membership discussed the unfair labor practices committed by the company at the meeting where they voted to strike, and that those incidents were among the reasons the employees voted to strike rather than accept the collective bargaining agreement presented by the union representatives. David Bates, a member of the union bargaining committee for six or seven years, testified before the ALJ that the employees were concerned about what had happened to Pugh and the "intimidating talk about the strike." He also stated that the employees talked about whether the strike would be an unfair labor practice strike at the meeting. Pete Jazdzyk, a union representative, testified that the membership was overwhelmingly opposed to the provisions of the proposed contract because the changes gave greater latitude to the employer to treat other employees as it had treated Pugh. In addition, he testified that people were upset about Boos Sr.'s conduct in threatening employees with losing their jobs if they decided to strike.

Before the strike vote was taken, Jazdzyk testified, he had explained to the membership that "we would regard this as an unfair labor practice strike because of the charges already being processed, and—and many of the complaints that I was hearing from the audience," including the cutting of Pugh's wages, the threats to Workman, and the threats of job loss to other members of the bargaining unit. He also testified that he had warned the em-

ployees that if the strike was ultimately ruled not to be an unfair labor practice strike, the employees could be permanently replaced. He further told the ALJ that essentially the entire group affirmed employee Cliff Oliver's statement from the back of the room that from his perspective it was "absolutely an unfair labor practice strike." Pugh, a bargaining committee member for nine years, corroborated Jazdzyk's testimony about the membership discussing the pending NLRB charges and about the strike being possibly an unfair labor practice strike. The ALJ found that Jazdzyk, Bates, and Pugh were credible as "truthful witnesses." In addition, employee Robart corroborated Jazdzyk's testimony by his own testimony that he was instructed by the union leadership to write down what management had said to him before the strike, indicating the union's preparation for proving an unfair labor practice strike

Based on all of this testimony, we find there is substantial evidence that the company's treatment of Jeff Pugh and the intimidating comments made by management to employees were, at a minimum, a contributing cause to the membership's vote to strike. The employees, in voting to strike, were expressing their lack of trust and their concern with management's treatment of their fellow employees and respect for the union. Based on the evidence before the ALJ and NLRB, it is reasonable to conclude that the union membership was partially motivated to vindicate their right to be free from their employer's coercion and intimidation.

The record also contains substantial evidence that the strike was prolonged by unfair labor practices, a factor that makes a strike an unfair labor practice strike. *See Calex Corp.*, 144 F.3d at 911. The company does not contest the Board's finding that it engaged in unfair labor prac-

tices on the picket line. Boos Jr. destroyed union property in the picket area, including seven or eight picket signs, the pickets' sign-in log book, all the logs available for firewood, and the plank placed over two stumps for a bench, by burning the property in a steel barrel used by the pickets as a stove to keep warm. When asked by striking employee Kimberly Navarini if he "felt like a big man for burning all our stuff," Boos Jr. responded by telling her that she "was a fat bitch who needed to go on a diet" and by spitting in her face. A few days later, Boos Jr. again had an encounter with the pickets. On this occasion, he grabbed one of the picket signs, shook it at the pickets, and said, "[I]f anybody makes another one of these signs, I'm going to hit you in the fucking head with it." He returned 40 minutes later and grabbed a new picket sign that had been made after he took the first one. All of this uncontested conduct violated Section 8(a)(1) by interfering with the exercise of striking employees' right to engage in protected picket activity. It is a reasonable assumption that such conduct, by its very nature, was likely to inflame the strike environment and prolong a strike.

We conclude that there is substantial evidence on the record that these uncontested, unfair labor practices by Boos Jr. prolonged the strike. Boos Jr.'s unlawful conduct further reinforces the Board's decision that the strike was an unfair labor practice strike.

■ Furthermore, we cannot say that the company "cured" or repudiated any unfair labor practices and thus converted the strike back to an economic strike, as the company now contends, citing *Gibson Greetings Inc.*, 310 NLRB 1286, 1993 WL 151871 (1993), *enforced in part*, 53 F.3d 385 (D.C.Cir.1995). The company argues it cured its unfair labor practices when it

reached a tentative agreement with the union on February 1 and again on February 14, 1998. We reject this claim outright. Curing or repudiating past unfair labor practices requires unequivocal, specific references to the employer's past action. *See Chicago Beef Co.*, 298 NLRB 1039, 1055–56, 1990 WL 122480 (1990), *enforced*, 944 F.2d 905 (6th Cir.1991); *see also Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1430 (2d Cir.1996) ("[T]he NLRB has acknowledged that an employer can effectively repudiate unlawful conduct if the repudiation is 'timely, unambiguous, specific in nature to the coercive conduct and free from other proscribed illegal conduct.'") (quoting *Passavant Mem'l Area Hosp. v. Health Care Local Union No. 1401*, 237 NLRB 138, 1978 WL 7798 (1978)). The company's tentative agreements do not meet the standard for repudiation, and apparently the company has never, to this day, disavowed or acknowledged its unlawful conduct. Nor has it taken any steps to assure its employees that it will not interfere with their rights in the future. We decline to hold that the strike was converted to an economic strike because of any action on the part of the company.

### CONCLUSION

For the reasons stated above, we order summary enforcement of the uncontested findings of the Board in this case. We also sustain the contested findings of the Board regarding the employer's statements to six employees and the nature of the strike, and we order enforcement of that portion of the Board's order. A review of the record as a whole reveals that the ALJ's decision, upheld by the Board, was supported by substantial evidence.

---

* The Honorable Peter C. Economus, United States District Judge for the Northern District

The company's petition for review is therefore denied.