NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED CLAY MINES CORPORATION, Respondent.

No. 12266.

United States Court of Appeals, Sixth Circuit.

Feb. 1, 1955.

Owsley Vose, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers and Rose Mary Filipowicz, Washington, D. C., on the brief), for petitioner.

Cecil Sims, Nashville, Tenn., for respondent.

Before ALLEN, MARTIN, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order of February 13, 1953 against the respondent, United Clay Mines Corporation, directing respondent to bargain collectively with United Brick and Clay Workers of America, A. F. L., hereinafter called the Union, as the exclusive representative of the employees at its plant at Gleason, Tennessee. Respondent, a New Jersey corporation with its principal office at Trenton, New Jersey, mines and processes ball clay and manufactures various clay products. Jurisdiction is conceded.

Following an election, the Board on February 4, 1949, certified the Union as the exclusive bargaining representative for the production and maintenance employees at the Gleason plant. Collective bargaining was immediately requested and entered into. Bargaining sessions were held by agreement on February 21–22, 1949, March 28, 1949, March 30, 1949, July 18–19, 1949, and October 2 through 4, 1949. The negotiations were recorded by a stenographer. The single question presented is whether such undisputed facts sustain the finding of the majority of the Board, to which two members dissented, that the respondent refused to bargain with the Union in violation of Sections 8(a) (5) and (1) of the Act. Sections 158(a) (5) and (1), Title 29, U.S.C.A.

Prior to the first meeting held on February 21 and 22, 1949, the Union mailed a proposed contract to the respondent. The Union was represented at the meeting by Paul Pelfrey, international representative, and a negotiating committee of four employees. Respondent was represented by its Vice President Hall, its Superintendent Henry and its attorney, R. F. Moll. Moll stated that the Union proposal was not acceptable to the Company, following which the parties proceeded to review the Union's proposed contract section by section. The contract covered subjects usually contained in such agreements, although the Union emphasized that it was chiefly concerned with the establishment of an equitable

seniority section and an effective grievance procedure.

Moll insisted that the Company retain the right to determine unilaterally all questions involving grievances and seniority. He rejected section by section the various demands of the Union which would have changed the existing method of operations. He submitted a counter proposition, which, in general, provided for the continuation of the existing method of operation, with a guarantee of existing wages, continuation of the current 40-hour work-week, three holidays a year and one week annual vacation. It also contained a provision against work stoppages by the Union. With respect to grievances, it provided that an earnest effort be made to settle and compose grievances "through negotiation and discussion between the Company and the Union or the aggrieved employee or employees." With respect to seniority it provided that the Company would in its discretion give due regard to such factors as length of service, knowledge, ability, physical fitness and usefulness to the Company, and that "If in the opinion of the Company other factors are equal, length of service will govern."

Pelfrey argued that the men could not sign away their right to strike for better conditions in exchange for a contract which actually gave nothing more than what they already had, but offered to furnish the respondent with a second proposal after he discussed its offer with the men. The parties thereupon agreed to meet again some time after March 15th, by which time the Union would draft and submit a new proposal.

The parties met again on March 28 and 30, 1949. During the interval the Union sent its new proposal to the Company. Moll pointed out that notwithstanding certain changes in language, the substance of it with respect to the basic provisions was the same as what was in the first proposal. Its provisions were discussed by the parties. Moll persisted in the position throughout the two sessions that although certain original demands had been modified, the provisions which were basically important to the Company, namely, grievances, seniority, and an unqualified no-strike clause, were still unacceptable. With respect to a substantial increase in wages proposed by the Union, Sunday premium pay, four hours call-in pay for employees sent home after reporting for duty, and an additional week of vacation for men with over five years service, Moll stated that the Company could not afford to increase its labor costs. Following a lengthy discussion, in which both Pelfrey and Moll explained their respective positions, Moll pointed out that the parties were far apart on the basic issues, that the Union had presented no new ideas with respect to these issues, that the Company was adhering to its position, and that the Company would be willing to meet again if and when the Union had any new ideas to present. Pelfrey said he had none at the time, but would talk to his men again and "find out just exactly what their thinking is."

The Union by letter of June 20th requested another conference which was held on July 18 and 19, 1949. John E. Addicks, Commissioner of the Federal Mediation and Conciliation Service, participated in the meeting at the request of the Union. Moll asked what new suggestions or proposals Pelfrey had to offer, and stated that the Company's position was still the same and that the Union's prior proposal was not acceptable. Upon the Commissioner's urging, the parties proceeded with a comparison of the Company's proposal and the Union's second offer. Agreement was reached on the preamble and the first two articles of the Company's proposal. With respect to wages, Moll stated that the Company was no longer in a position to bind itself to maintain present wages for a year, but would probably need a wage decrease in order to remain competitive in the field. Tentative upon agreement as to an entire contract, the Union agreed to the remaining provisions of the Company's proposal except the one dealing with grievances. The Company refused to change from its former position on this

issue, with Moll refusing arbitration and insisting that the final decision on all grievances rest completely in the Company. The Union submitted a different upward wage adjustment which Moll rejected on the grounds that because of economic conditions any increase in costs was "just out of the question." Moll invited the Union to adjust a cut in wages because of economic conditions, which the Union declined, pointing to the cost of living and suggesting that the economic picture was only reflecting the seasonal period of the year. The parties agreed to meet again on August 2nd by which time Moll could obtain certain wage data, which he said he needed.

The Company representatives and the U. S. Commissioner met on August 2, 1949, but no one appearing for the Union the meeting was postponed until 10:00 a. m. August 3rd. The parties recognized that a tentative agreement had been reached upon all matters except wages, vacations and grievance procedure. Moll stated that from the standpoint of sound business, the Company should have a decrease in wages, but since this would be a very serious thing for the Union the Company had finally concluded not to insist on the wage decrease if an agreement in all areas could be reached. He renewed the Company's offer to maintain the present wage scale and one week vacation allowance, but rejected again as being "out of the question" the Union's request for an additional week's vacation for 5-year men. Discussion ensued concerning a reduction in force at the plant with the Union contending that the lay-off was not based upon economic reasons, and, in any event, was not being carried out on the basis of seniority. Moll attempted to justify the Company's proposed action in the matter. The Union brought the discussion back to the proposed contract and presented a third proposal which incorporated the Company's wage, hour, and vacation proposal, an injunction against strikes over such matters, but omitted the Company's seniority, grievance and management prerogative proposals. Moll

stated that the proposal was not acceptable to the Company because it omitted provisions concerning matters that were in disagreement and which were very necessary to the Company, and that he did not want these matters to be left out of the agreement or to be subject to any oral understanding. The Union then offered to sign the Company's proposal in its entirety provided the parties reached an agreement as to the grievance procedure. Moll replied that the Company had no new ideas on that issue. Pelfrey argued that the grievance issue was the only point of disagreement between the parties, but on that issue the Union wanted some form of appeal from the Company's decision on grievances. Moll declined to agree to this suggestion. The Commissioner, after separate private conferences with the Company's representatives and the Union's representatives, announced that the Union was still insisting on some form of appeal from the decision of the Company, to which Moll replied,—"Well, it looks like we have failed to agree. Have you any other ideas, Mr. Addicks?", to which the Commissioner replied, "I think I have reached my limit as far as ideas are concerned." The meeting then adjourned with the Commissioner expressing the hope that the parties would get their ideas together so as to settle the one point at issue. The parties agreed that it appeared to be a very important point to each of them.

The Union by letter of August 10th submitted to Vice President Hall three alternative grievance provisions, which Hall forwarded to Moll for answer. On August 24th, having received no answer from Moll, the Union filed its first charge in this proceeding. On September 7, the Union wrote withdrawing its offer of August 10th and submitted a contract similar to the one it offered to the Company at the August 4th meeting. Moll replied on September 15th that there was nothing new in the alternative grievance proposals and that the Company's position in regard to this subject was unchanged. Further correspondence ensued between the parties in which an

unsuccessful effort was made by the Union and the Commissioner to get the Company to change its position.

In December 1949, Commissioner Addicks made another effort to arrange a meeting between the parties in January 1950. Addicks died unexpectedly and the meeting was arranged by his successor for March 6, 1950. Before this date arrived, the Union's international representative demanded that the employees strike. However, the employees decided not to strike and instead withdrew from the Union.

A majority of the Board were of the opinion that although the respondent displayed a willingness to meet with and talk to the Union, it nevertheless entered into the negotiations with the intent of preserving the appearance of bargaining while repudiating, through its inflexible attitude and positions, that good faith without which collective bargaining is meaningless, and ruled that the respondent had refused to bargain with the Union in violation of Sections 8(a) (5) and (1) of the Act. The two dissenting members were of the opinion that the evidence showed only that the respondent did not yield to the Union's demands. They said "The respondent bargained 'hard,' for retention of its power of final disposition of grievances. And it bargained hard for a blanket no-strike clause. Both these subjects were discussed at great length during negotiations. * * * The majority's decision, carried to its logical conclusion, would cast the suspicion of illegality upon any union or employer which takes a firm stand in collective bargaining."

The Supreme Court, shortly after the enactment of the National Labor Relations Act in 1935, construed the meaning of collective bargaining required of an employer by the Act. In N. L. R. B. v. Jones & Laughlin, 301 U.S. 1, at page 45, 57 S.Ct. 615, at page 628, 81 L.Ed. 893, it said: "The Act does not compel agreements between employers and employees. It does not compel any agreement whatever. * * * The theory of the act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the act in itself does not attempt to compel." Thereafter several Courts of Appeals expressed the view that while the Act does not compel employer and employees to agree, it contemplates that agreements will be reached as the result of collective bargaining, and that the employer is obligated to bargain in good faith with respect to all matters which affect his employees as a class, including wages, hours of employment and working conditions; that when an employer enters into negotiations with a labor union with his mind hermetically sealed against the thought of entering into an agreement with the Union he is guilty of refusing to bargain collectively in good faith as required by the Act and is therefore guilty of an unfair labor practice. N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632; N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, certiorari denied 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. 1118, rehearing denied 312 U.S. 713, 61 S.Ct. 619, 85 L.Ed. 1144; Wilson & Co. v. N. L. R. B., 8 Cir., 115 F.2d 759; N. L. R. B. v. Westinghouse Air Brake Co., 3 Cir., 120 F.2d 1004, 1006. Under this theory of the Act, it was held that the duty to bargain collectively required the employer to make every reasonable effort to reach an agreement and if the proposals of the employees were unacceptable, to match such proposals with counterproposals. In 1947, the fear was expressed in Congress that the Board, under the guise of determining whether or not employers had bargained in good faith, was setting itself up as a judge of what concessions an employer must make and of the proposals and counterproposals that he may or may not make. N. L. R. B. v. American Nat. Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027. Accordingly, the Labor Management Relations Act of June 23, 1947 defined the phrase "to bargain collectively" as the "mutual obligation of the employer and the representative of the employees to meet at

reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession." Section 158(d), Title 29, U.S.C.A. This amendment was referred to by the Supreme Court in N. L. R. B. v. American Nat. Ins. Co., supra, [343 U.S. 395, 72 S.Ct. 829] in the following words: "Thus it is now apparent from the statute itself that the Act does not encourage a party to engage in fruitless marathon discussions as the expense of frank statement and support of his position. And it is equally clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements."

The Act, as so amended, still requires good faith in such negotiations. Lack of good faith may be found from a refusal to discuss certain subjects or by insisting that negotiations be carried on by mail; N. L. R. B. v. Jacobs Mfg. Co., 2 Cir., 196 F.2d 680; from a refusal to read or study proposals submitted by the other party and in taking the position that all the Act required is to meet, Wheatland Electric Cooperative v. N. L. R. B., 10 Cir., 208 F.2d 878; by refusing to recognize agreements made by a bargaining representative after leading the Union to believe that the bargaining representative had full authority to conclude an agreement, N. L. R. B. v. Nesen, 9 Cir., 211 F.2d 559; N. L. R. B. v. Shannon, 9 Cir., 208 F.2d 545; by long delays unaccounted for in the matter of correspondence and the preparation of documents, the postponement of meetings without satisfactory reasons therefor, the reopening of items already settled and the posing of new demands when an agreement seems imminent, N. L. R. B. v. National Shoes, 2 Cir., 208 F.2d 688, and by similar conduct clearly showing an intent not to enter into a contract of any nature. But the amendment makes it clear that the failure to reach an agreement because of the employer's refusal to make a concession to the Union does not, by itself, constitute lack of good faith. As recognized in N. L. R. B. v. National Shoes, supra, at page 691, "The failure of such negotiations is not in itself determinative", and as stated in N. L. R. B. v. Jacobs Mfg. Co., supra, 196 F.2d at page 684, "To bargain collectively in compliance with the statute does not mean that an employer must produce proof to establish that he is right in his business decision as to what he can, or cannot afford to do. He is left free to decide that himself and, at the end of the bargaining, may agree only insofar as he is willing in the light of all the circumstances."

In the present case, the respondent promptly met with the Union at its request, and interposed no objections or delays to later meetings whenever requested by the Union. Its negotiators were fully authorized to act. It submitted a proposed contract which it was willing to execute. The Union's proposals and its own proposals were discussed in detail in lengthy sessions. From the start respondent made its position clear that it would insist upon certain provisions, which, in its opinion, were basically important to the continued successful operation of the Company, such as the unqualified no-strike clause and settlement of grievances by Company management without compulsory arbitration. The Company's position on these issues was not acceptable to the Union. The Union's counterproposals on these issues were not acceptable to the Company. The negotiations, after a period of months, finally resulted in a tentative agreement with respect to all matters except the settlement of grievances. The failure to execute a contract was not because of a failure or refusal to negotiate, but in the final analysis was because the parties would not agree on one remaining issue, considered by both of them as basically important. To say that the Company should have accepted the Union's proposal on this issue is to ignore the language of the statute that the obligation to bargain collectively "does not

**126**

compel either party to agree to a proposal or require the making of a concession."

 The Board stresses the fact that the Union had already made many concessions while the Company had made very few and that in fairness to the Union it should have made this concession. But the concessions made by the Union were not concessions of rights which the employees then possessed. Actually, the Union gave up nothing; it merely abandoned certain demands which had never been agreed to, many of which involved increased labor costs, which the Company would not agree to on grounds not shown by the record to be unreasonable. We find nothing in the Act which requires an employer to abandon a settled position on a certain issue because of either the quantity or quality of concessions offered by the Union in the hope of securing such abandonment. It is still a matter of bargaining.

The board also stresses the fact that the Company refused to submit alternate proposals about the grievance issue at the request of the Union after it had refused to accept the Company's original proposal, and that the inflexible attitude of the Company contributed nothing to the success of the negotiations. But the statutory right to decline to make a concession includes the right to firmly stand on a proposal previously made and not accepted.

In our opinion, the matter resolves itself into purely a question of hard bargaining on the part of the respondent. It is not for the Board or the Court to determine what in their opinion the respondent should have agreed to, and, in effect, make the contract for the parties. To decree enforcement of the order, would, as a practical matter, force the respondent to make a concession or be proceeded against for contempt of court. While the Act compels negotiations, which usually result in reaching an agreement, it contains no authority to force an agreement where the parties have reached an impasse. N. L. R. B. v. American Nat. Ins. Co., supra; N. L. R. B. v. Landis Tool Co., 3 Cir., 193 F.2d 279; N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 195 F.2d 632.

Enforcement of the Board's order is denied.