**HORSEHEAD RESOURCE DEVELOPMENT CO., INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 96–6268, 96–6466.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 27, 1997.

Decided Aug. 28, 1998.

Harold George Korbee, Wood & Lamping, Cincinnati, OH, Roger K. Quillen (argued and briefed), Charles Kelso, Fisher & Phillips, Atlanta, GA, for Petitioner Cross–Respondent.

Aileen A. Armstrong, Deputy Associate General Counsel (briefed), Frederick C. Havard (argued and briefed), David I. Goldman (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent Cross–Petitioner.

Before: MARTIN, Chief Judge; KENNEDY and NELSON, Circuit Judges.

DAVID A. NELSON, J., delivered the opinion of the court, in which KENNEDY, J., joined. BOYCE F. MARTIN, JR., Chief Judge (pp. 341–44), delivered a separate dissenting opinion.

## OPINION

DAVID A. NELSON, Circuit Judge.

Adopting recommendations made by an administrative law judge, the National Labor Relations Board concluded that the petitioner, Horsehead Resource Development Co., Inc., violated the National Labor Relations Act by (1) engaging in dilatory collective bargaining tactics that constituted a refusal to bargain in good faith, (2) locking out bargaining unit employees in furtherance of the alleged refusal to bargain, and (3) indiscriminately videotaping employees who protested the allegedly unlawful lockout. Horsehead has petitioned this court for review of the Board's order, and the Board has cross-petitioned for enforcement.

Except as to the videotaping issue, we conclude, the Board's unfair labor practice findings are not supported by substantial evidence in the record as a whole. When viewed in its entirety, as the caselaw teaches it must be, the record comes nowhere close to demonstrating a refusal to bargain in good faith. And in this case, as in *Pease Co. v. NLRB*, 666 F.2d 1044 (6th Cir.1981), "[o]ur examination of the specific indicia relied on

by the ALJ and the Board leads us to conclude that neither the proposals nor the tactics of the Company, nor the sum of its conduct, amounts to substantial evidence of bad faith." *Id.* at 1049. We shall therefore grant Horsehead's petition and deny the Board's cross-petition, for the most part, granting enforcement of the Board's order only insofar as it relates to the company's indiscriminate electronic surveillance of picketers.

I

Horsehead is in the business of recycling hazardous wastes, primarily electric arc furnace dust produced as a by-product in the making of steel. Horsehead's headquarters are in New York City, and the company operates plants (all of which are unionized) in Illinois, Pennsylvania, and Tennessee.

Through processing in kilns at Horsehead's various plants, electric arc furnace dust is turned into a slag-like material and crude zinc oxide. The zinc oxide is ultimately converted into relatively small quantities of lead and relatively large quantities of zinc calcite. The latter commodity is sold for use as a furnace feed at prices based on the London Metals Exchange spot price for zinc.

The profitability of Horsehead's business is affected both by the market price of zinc and by the extent of available landfill capacity. (Although Horsehead normally disposes of between 60 and 80 percent of all electric arc furnace dust generated in the United States, such dust can also be disposed of in landfills.) About half of Horsehead's revenues traditionally come from the sale of recovered products—mainly zinc—and the other half come from fees that producers of furnace dust pay for disposal of the substance.

During 1993—the last full year of a labor agreement that covered bargaining unit employees at Horsehead's Rockwood plant in rural Tennessee—zinc prices plunged to their lowest levels in 20 years. At the same time, according to the testimony of Horsehead's president, a glut of landfill capacity led to increased competition from landfills. Calendar 1993 proved to be the first unprofitable year in Horsehead's history, and the price of

the company's stock fell more than 70 percent.

In response to these financial pressures Horsehead cut its work force by 10 percent, slashed its research and development budget, and froze salaries for all non-bargaining unit employees. The company also began reexamining its health care costs.

Containment of health care costs became the responsibility of Martha Koletar, whom Horsehead hired in the fall of 1993 as vice president for human resources. She was charged with completely redesigning the company's health care program, which had theretofore been operated without any contributions from participants. Effective February 1, 1994, all non-union employees were required to start paying 15 percent of the program's cost. Zinc prices, by that time, had fallen to about 50 percent of their previous levels.

Ms. Koletar was also put in charge of negotiating a new labor contract at the Rockwood plant. The existing contract (which had been negotiated over a 12–day period in 1991) was terminable on March 1, 1994. Ms. Koletar's instructions were to come up with a replacement contract that (a) would provide for worker contributions toward health care costs, and (b) would not increase total labor costs at Rockwood by more than five percent. Within those parameters, the record establishes, Ms. Koletar and her negotiating team had full authority to conclude an agreement.

The bargaining representative of the workers at the Rockwood plant was the Oil, Chemical and Atomic Workers International Union, AFL–CIO. An agent of that union, John Williams, notified the company by letter dated December 8, 1993, that the union would terminate the existing agreement as of March 1, 1994. The letter concluded with an offer to meet at a mutually agreeable date to negotiate a new agreement.

At some point after she received the letter, it appears, Ms. Koletar telephoned Mr. Williams and asked him to meet with her at the plant. He did so late in December, and they talked about a number of subjects, including the upcoming contract negotiations. Ms. Koletar indicated that the company was

going to have "a major contract proposal," according to Mr. Williams' subsequent testimony before the administrative law judge. Ms. Koletar also told Mr. Williams that "health insurance was a problem." Before the formal negotiations began, the ALJ determined, Ms. Koletar told Mr. Williams explicitly that the company would be seeking employee contributions toward employee health care costs. Williams replied that the union might go out on strike over this issue.

Although no specific date was set for the commencement of formal negotiations, Mr. Williams testified that the parties agreed "tentatively" to start negotiations in mid-January. Sometime after the first or second week in January, however, Ms. Koletar told Mr. Williams that Monday, February 7, was the earliest the company could meet. Williams' reaction, he testified, was that "this is kind of disturbing, because we had tentatively agreed to start and exchange proposals early." Williams went on to tell Ms. Koletar that February 7 would be "kind of crowding it" if the company was going to have an extensive proposal. Ms. Koletar insisted, however, that February 7 was the best the company could do. (She explained at the evidentiary hearing that her time in January was consumed with health insurance paperwork and familiarizing herself with her new employer's operations. She also testified that Thomas Knepper, the director of operations at the Illinois and Tennessee plants and a member of the company's negotiating team, was tied up at another location during the last week in January.)

Negotiating teams for the two sides did in fact start a series of bargaining sessions on Monday, February 7, 1994, using the facilities of a Holiday Inn recommended by Mr. Williams near the Rockwood plant. Both sides presented opening proposals at the February 7 session, and the union's proposal—unlike the company's—called for an increase in wages.[1]

Pointing out that workers at the company's plant in the Chicago area were currently receiving substantially higher wages than

workers at the Tennessee plant ($14.00 per hour versus $10.90 per hour for kiln operators, *e.g.*), the union made an opening wage demand designed to bring pay at the rural Tennessee facility into line with pay at the metropolitan Chicago facility. The union asked for pay increases at the Rockwood plant totaling 46 percent over the life of a new three-year contract.

Given the union's interest in bringing Tennessee wage rates into line with Chicago wage rates, plus the union's strong objection to sharing health care costs, and given the likelihood that the company might prove reluctant to compound its existing financial problems by making major concessions on economic issues, it is perhaps not surprising that the union should have begun to prepare for a strike. And Ms. Koletar testified without contradiction that as early as the second negotiating session, which was held on Tuesday, February 8, the union announced that a strike vote had been taken.

It is also not surprising that the company should have proposed, as it did, that non-economic issues be discussed ahead of economic issues. The union had no objection to this, as the record establishes without contradiction, and only non-economic issues were addressed at the February 8 session and at a follow-on meeting held the next day.

At the end of the February 9 session there was a discussion of the scheduling of future meetings. The president of the local union did not want to meet on weekends, according to Ms. Koletar's testimony, and the parties agreed to meet on Wednesday and Thursday of the next week (February 16 and 17), with subsequent negotiating sessions to begin on Tuesday, February 22. (Mr. Williams told the company he had a conflict that would make him unavailable on Monday, February 21.) Mr. Williams expressed the hope that the negotiators would agree on a contract which he could present to his membership at a meeting scheduled for Friday evening, February 25.

---

1. It was understood by all concerned that although the company did not address the wage issue in its opening proposal, the company

planned to present a wage offer in the final phase of the bargaining process.

Mr. Williams' hope was not realized. Although the negotiating sessions went forward on the agreed dates, and although considerable progress was made on non-economic issues, economic issues proved to be another story.

At the February 22nd session the company presented a specific proposal for employee contributions to health care costs. Mr. Williams remained adamant on this issue, telling the company that it would be "a cold day in hell" before the union agreed to any such thing. He pointed out that the company was paying 100 percent of the health care costs at the Chicago plant, and he was evidently not impressed by the company's assurance that health care would be on the table when the Chicago labor agreement came up for renegotiation.

Neither did Mr. Williams and his colleagues take kindly to an observation by Ms. Koletar that the union's wage demands for the Tennessee plant—demands which she said would raise the company's labor costs by more than $2 million—were "totally unreasonable." The ALJ found that "[n]egotiators on both teams lost their tempers and harsh words were exchanged." The meeting ended with no progress having been made, according to the ALJ.

Both teams returned to the bargaining table the next morning, February 23, and they were able to come to terms on a contractual grievance procedure. Progress on economic issues remained elusive, however, except for an agreement to implement a retirement plan identical to that at the Chicago plant. The meeting on the 23rd was described by Ms. Koletar as "very volatile." At one point, she testified, Mr. Williams said "that his Union was trained in wars and if that's what we wanted that he's gone through bloodshed."

On the evening of February 23, six days before the projected expiration of the contract, the company told Mr. Williams that salaried employees were being brought in from out of town to run the plant in case of a strike. The company also brought in securi-

ty guards who, like the salaried employees, were housed at the Holiday Inn. The union representatives now began to disclaim any intention of striking.

The parties met for more than seven hours on February 24, this time with a federal mediator in attendance. The company withdrew or altered a number of cost-saving proposals to which the union had objected, and agreement was reached on small increases in meal allowances, production guarantees, and hours of severance pay.

On Friday, February 25, the company finally offered a wage increase. Without retreating from its position on health plan contributions—the company was proposing an employee contribution (tax-advantaged under § 401(k) of the Internal Revenue Code) that would come to about 25 cents per hour—Horsehead offered an hourly wage increase of 25 cents in the first year of the contract, 25 cents in the second year,[2] and 10 cents in the third year. The existing average base rate was $10.04 per hour, so over the life of the contract the company's offer would have increased wages by approximately six percent, not taking health care into account.

The union countered the company's offer with a demand for wage increases of $2.00 per hour in the first year, 75 cents in the second year, and 50 cents in the third year—an overall wage increase of more than 32 percent, with no contribution to health care costs. Ms. Koletar communicated this demand to her superiors in New York, she testified, and was informed that her negotiating authority remained unchanged.

As the president of the local union recalled it, the company negotiators said they were having difficulty getting anyone in New York to talk to them. Be that as it may, either the mediator or Ms. Koletar suggested that it might be productive if the union would make another wage proposal. The union did so toward the end of Friday afternoon, proposing increases totaling $2.85 per hour (28.5 percent) over the life of the contract. After a caucus, the company negotiators claimed

---

**2.** The ALJ was under the impression that the proposal was 15 cents for the second year, but it is undisputed that he was in error on this point.

that they could not get through to New York. The discussions were then adjourned so the union negotiators could attend the previously scheduled meeting of the union membership.

The negotiating teams met again, briefly, at around 8 o'clock on Friday evening. Mr. Williams reported that "the troops were not happy," but he said he had got through the meeting of union members and made it back. He then asked if there were "any news," according to notes kept contemporaneously by company representatives. He was told that although the company's offer was still on the table, the negotiators had not been able to contact the people in New York. Another session was then scheduled for Sunday, February 27.[3]

Mr. Williams had been staying at the Holiday Inn during the week. With no meeting scheduled for Saturday, however, he returned to his home in Johnson City, Tennessee. The management negotiators, who had also been staying at the hotel (and who had now been joined there, as indicated above, by the security guards and the salaried employees from other plants), remained at the hotel over the weekend.

The tranquility of the weekend was marred by two incidents. At approximately 9:30 Friday evening, according to the testimony of the desk clerk then on duty at the Holiday Inn, an unidentified man telephoned the hotel with a bomb threat. The desk clerk was told that a bomb would go off in half an hour or so, and "you better get your ass out of the motel." The desk clerk immediately called the police, who responded within five minutes.

With a fire engine standing by, the police checked out the hotel lobby, the perimeter of the building, and some packages that had been left at the front desk. The manager of the hotel was contacted, and she decided to close the restaurant but not to evacuate the whole building.

Horsehead Operations Director Thomas Knepper saw flashing lights outside his hotel room shortly before 10 o'clock. Learning of the bomb threat from the desk clerk, Knepper conferred with his immediate superior about waking up the Horsehead people and getting them out of the hotel. The two men decided to follow the manager's lead, and no one was evacuated. "[F]or whatever reason," the ALJ subsequently found, "neither the hotel management [n]or Knepper took the alleged bomb threat seriously." There proved to be no bomb, fortunately, and the identity of the person making the threat was never discovered.

The second incident was one the significance of which proved marginally harder for the ALJ to denigrate. Shortly after the 11:00 p.m. shift change on Friday, and after the yard lights at the fenced Rockwood facility had twice gone dark for no apparent reason earlier in the evening, only to come on again after ten minutes or so, shift supervisor Danny Foster found that a double-wide trailer which had once been the plant's main office building was in flames.

Mr. Foster ran to the control room, called the fire department, and used his radio to summon all of the workers who were on duty. Two of the employees were sent for fire extinguishers, but they returned with empty equipment. (Empties were supposed to be kept in front of the door to the shop, according to Mr. Foster, while fully charged extinguishers were kept in a location at the back.) Told by Foster to "get me two more damn fire extinguishers," the men returned with two more empties. The fire department then arrived and was able to put out the blaze. By that time the trailer was a total loss.[4]

The firemen ruled out an electrical problem as a source of the fire, and they were able to determine that a window had been knocked out of the trailer before the fire

3. Mr. Williams testified that although he suggested a Saturday meeting, the company could not meet then. The company's notes indicated, as did the testimony of Operations Director Thomas Knepper, that both sides said they would be available over the weekend, and it was the federal mediator who proposed a Sunday meeting.

The ALJ credited Williams' testimony, and we cannot say this was clearly erroneous.

4. The next morning, Foster testified, one of the bargaining unit employees commented, in Foster's presence, "you think the trailer fire is something, wait till somebody's house burns."

began. This, plus a strong smell of the fuel oil by which the progress of the fire had been accelerated, led the firemen to suspect arson.

At about 2:30 in the morning on Saturday, February 26, the plant manager called Operations Director Knepper at the Holiday Inn to report, as Knepper subsequently testified, that the trailer had been "torched." After ascertaining that no one had been hurt, Mr. Knepper arranged to get extra supervision at the plant for the remainder of the night.

Knepper went to the plant himself after sunup and inspected the burned out trailer. It still smelled of fuel oil. The company had intended to house security guards in the trailer if there were a strike, Mr. Knepper testified, and now, given the potential for an "environmental incident" if the plant continued to operate, Knepper felt that he had to have security people on the site right away. He had known beforehand that Horsehead's president, William Quirk, would be available by telephone on Saturday to discuss the labor negotiations, but in Knepper's mind the immediate question had become "what do we do to hold the plant together."

Reaching Quirk on the telephone, Knepper explained the situation to him and received authorization to bring the security people on site that day. Knepper was also authorized to get another trailer for the security personnel so they could remain in the plant overnight.[5]

With Mr. Quirk's approval, Knepper telephoned union agent Williams, told him about the torching of the trailer, and rescheduled the Sunday negotiating session for Monday. Mr. Williams had no objection to cancellation of the Sunday meeting, Knepper testified, and the union agent seemed shocked by the news of the fire. Mr. Knepper was convinced that the fire had been set by disgrun-

tled employees acting without the knowledge of the union leadership.[6]

In addition to dealing with plant security matters on Saturday—Knepper arranged, among other things, to double up on supervision in an effort to forestall further acts of sabotage—Knepper and his boss discussed what they perceived as a need for "more help than we had available" at the bargaining table. President Quirk gave permission for the management team to bring in a highly experienced negotiator from an affiliated company. The new negotiator—a man named John Brown—flew to Tennessee on Sunday morning, February 27.

Mr. Brown worked with the management team until 11:00 o'clock in the evening, and during the course of that Sunday the team conducted several conference calls with Mr. Quirk and his associates in New York. Quirk had not wanted to raise the company's initial wage offer on Friday, he testified, because the union was still talking about wage levels at Chicago—and "we wanted to get the Union's attention and let them know that [Chicago] wages were not in the cards here." But Mr. Quirk further testified that, over the weekend, he came up with a new idea for sweetening the company's wage offer.

The idea stemmed from the fact that the low price of zinc represented a major economic constraint for the company. The company's profitability could be expected to improve if zinc prices rose in the future, and Mr. Quirk developed a mechanism for sharing any such gains with the bargaining unit employees. Under this scheme the employees would receive annual bonuses tied to increases in the price of zinc on the London Metals Exchange. For every penny by which the price of zinc rose above 45 cents per pound (the price was 48 cents at the time of the hearing), each employee would receive

---

5. The burned-out trailer was replaced the same day, before a more extensive arson investigation could be conducted. The ALJ speculated that the company "did not really desire such an investigation since it might establish the fire to have been caused by something other than arson. Simply an accidental fire not intentionally caused by anyone." This hypothesis, as we read the record, seems ludicrous.

6. In an effort to avoid an argument with members of the union negotiating team, Mr. Knepper acknowledged at the Monday negotiating session that the fire could have been started by residents of nearby Clymersville. Citizens of Clymersville had recently brought an environmental lawsuit against Horsehead. The record contains substantial evidence pointing toward a disgruntled employee as the arsonist, however, and Mr. Knepper testified that he never believed that the fire had been started by outsiders.

an "LME bonus" of $50.00, subject to an overall limit of $750.00 per year. If the price of zinc reached 60 cents, the bonus would be the equivalent of an additional pay hike of about 37 cents per hour.

The company put the LME bonus on the table at the negotiating session that began Monday morning, February 28. In addition, the company offered to waive all health insurance contributions throughout the first year of the contract; to front-load the first year's hourly pay increase by converting it to a $500.00 signing bonus; to increase wages by an additional five cents per hour in the second year, and a like amount in the third year; and to increase company-provided life insurance by $8,000 over the life of the contract. The company also accepted union demands relating to seniority for probationary employees and to bereavement pay. A drug policy for the plant was agreed to as well, along with a 12–hour shift provision that had been a major issue in the negotiations.

None of this was sufficient to produce agreement on a new contract before the old contract expired. The union reduced its wage demands by 10 percent, but "[t]hey were still in Chicago," as Ms. Koletar put it, "and we were in Rockwood."

In order to give the union team more time to analyze the company's proposals, the company offered to extend the existing contract—which had a provision barring either a strike or a lockout—for an additional 24 hours. The union rejected the extension offer out of hand.

On Monday afternoon, according to Thomas Knepper's testimony, the management people began talking among themselves about the possibility of a lockout. Because of the hazardous nature of the business, Mr. Knepper said, and in view of the bomb threat and fire, Knepper was very concerned about letting bargaining unit employees into the plant to work without a contract. These concerns were discussed with the company's president, Mr. Quirk, and Quirk testified that sometime around 5:00 p.m. on Monday he made the decision to implement a lockout. The union representatives were promptly told that without a contract, there would be no work.

The union negotiators then presented the company's latest contract offer to the bargaining unit members, who rejected the offer by unanimous vote. Later in the evening, at about 9:00 p.m., the union negotiators appeared unexpectedly at Ms. Koletar's hotel room and gave her a written demand for a wage increase amounting to about 24 percent over the life of the contract. Ms. Koletar, who had been suffering from the flu, said she would show the proposal to her colleagues and get back to the union on it. She never did get back to the union directly, but there is uncontradicted testimony that she advised the federal mediator of the proposal and told him that "we were still miles apart." The mediator did not suggest scheduling another meeting, and Ms. Koletar considered the gap so wide that she did not think another meeting at that point would be productive.

With the expiration of the contract on Tuesday morning, March 1, 1994, the company locked out the members of the bargaining unit and started operating the plant with salaried employees. In the course of the first day, according to testimony which the ALJ discredited on grounds that make little sense to us, the company discovered that a conveyor belt had been cut, clothes had been jammed into recycling pipelines, feed tanks had been stuffed with vacuum hoses, and chutes between the feed bins had been stuffed with axe handles. Found in the control room of the plant was a drawing of a man wearing a Horsehead hardhat inscribed with the words "Yankee Scab." The man was depicted as being in the cross hairs of a rifle scope. A caption on the drawing read "CLEANING UP THE 'SOUTH' AT 500 YARDS." Perhaps we may be forgiven for doubting that this macabre bit of regional folk art came from the pencil of some kindly environmentalist in Clymersville.

Before the lockout began, it appears, Horsehead installed a video camera at the front gate of the plant. The union set up a picket line within range of the device, and the camera was operated continuously throughout the first day of the lockout. Thereafter the camera was turned on whenever company personnel or other non-union members (such

as customers) crossed the picket line to enter or leave the plant.

In addition to the camera at the front gate, Horsehead placed video cameras in two "rovers" (roving automobiles) with which it patrolled the inside perimeter of the plant. After an incident in which a union employee appeared to be trying to run a Horsehead management car off the road, the rovers began to escort the vans in which replacement employees were shuttled between the hotel and the plant. Union representative Williams testified that the company also used the rovers to videotape union members as they parked their cars, gathered to talk in the shade, or moved to and from the picket shack and the portable restroom.

The videotaping continued for several weeks. It captured evidence of misconduct on the part of four employees that was sufficiently serious to justify their discharge.[7]

The lockout, as we have said, did not spell an end to the company's efforts to come to terms with the union on a contract. Ms. Koletar, to Mr. Quirk's surprise, returned to New York shortly after the start of the lockout. She was promptly replaced by John Brown as the company's chief negotiator. On March 4, 1994, the company sent the union membership a letter (drafted earlier by Ms. Koletar) referring to an "impasse" in the negotiations but expressing the company's willingness to meet with the union representatives in an effort to resolve the deadlock. Mr. Quirk sent the union a letter, also dated March 4, notifying it of the company's designation of Mr. Brown as its head negotiator. On or before March 7, 1994, Brown called union agent Williams and scheduled another negotiating session for March 10. Eleven more sessions followed, and shortly before the end of the year the negotiations culminated in a new collective bargaining agreement. Without going into detail, it is fair to describe the new agreement as a "Rockwood contract" rather than a "Chicago contract."

## II

Meanwhile, on March 15, 1994, union representative John Williams signed an unfair labor practice charge accusing Horsehead of refusing to bargain in good faith. This charge—filed with an NLRB regional director on March 18—led to the issuance of a complaint by the Board's General Counsel on May 6, 1994. The General Counsel alleged

— that from and after February 7, 1994, Horsehead had "failed and refused to bargain in good faith with the Union ... and has met with the Union with no intent to reach a collective bargaining agreement with the Union;"

— that Horsehead commenced an illegal lockout on March 1, 1994, "at a time when it had failed and refused to engage in good faith bargaining ...;" and

— that since March 1, 1994, Horsehead had engaged in illegal surveillance of its employees' activities on behalf of the union by videotaping such activities.

Following the issuance of an amended complaint in July, the case went to trial before the administrative law judge in October of 1994.

To demonstrate its good faith desire to enter into a contract, Horsehead offered evidence of the parties' continuing negotiations after the expiration of the contract. The ALJ gave little or no weight to this evidence, opining that "the content of the bargaining sessions subsequent to the March 1 lockout and whether or not [Horsehead] bargained in good faith after the lockout is not critical or essential to the question of whether they bargained in good faith prior to the lockout." Horsehead subsequently filed a motion to supplement the record with evidence of further negotiations, but the ALJ denied the motion *sua sponte* on the ground that the evidence was irrelevant.

On July 31, 1995, the ALJ issued a recommended decision and order finding Horsehead guilty of having failed to bargain in good faith, of having resorted to an unlawful

---

**7.** The misconduct involved placing "jackrocks" (six-pronged objects constructed from bent nails) and roofing nails in the road to puncture tires, using a slingshot to shoot ball bearings at a truck and through the windshield of a car, and spitting in the face of a security guard as he drove through the picket line.

lockout in furtherance of bad faith bargaining, and of having conducted unlawful surveillance of union activities. The ALJ relied heavily on what he perceived to be deficiencies in Horsehead's substantive bargaining proposals; Horsehead's postponement of the mid-January starting time for the negotiations; the company's failure to make a wage proposal early in the negotiations; the negotiators' supposed inability to reach top management on Friday afternoon, February 25, 1994; and the postponement of Sunday's meeting to Monday, February 28, in the wake of Saturday's fire. Based on the videotape evidence presented by the company, the ALJ did vindicate Horsehead's decision to discharge four employees for picket line violence.

Horsehead excepted to the ALJ's decision and filed a second motion to supplement the record, this time proffering evidence that the parties had reached a new collective bargaining agreement. The Board denied the motion as "immaterial to the issue of whether [Horsehead] violated the Act by the conduct referred to in the complaint, which occurred in early 1994." Adopting virtually all of the ALJ's findings, the Board issued a decision and order on August 27, 1996, requiring Horsehead to bargain in good faith and to reinstate the locked-out employees with back pay. In a separate opinion, Board Member Charles I. Cohen concurred in the result on a limited basis. The petition for review and cross-petition for enforcement followed.

### III

Our task is to review the record as a whole in order to ascertain whether the Board's determinations are supported by evidence that qualifies as "substantial" in light of the entire record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *"Automatic" Sprinkler Corp. of Am. v. NLRB*, 120 F.3d 612, 616 (6th Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998).

■ *Substantial* evidence has been described as evidence which a "reasonable mind might accept as adequate to support a conclusion." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997). We may not

overturn a decision of the Board merely because we might have viewed the case differently, but neither may we simply rubber stamp the Board's decision. See *Universal Camera*, 340 U.S. at 488, 71 S.Ct. 456; *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1292 (6th Cir.1997).

Taken as a whole, as we read it, the record in the case at bar contains no evidence of sufficient substantiality to support the conclusion that Horsehead was guilty of refusing to bargain in good faith. The evidence on which the Board's decision rests, in other words, is not what a reasonable mind could accept as adequate to demonstrate that the company did not honestly wish to hammer out a labor contract it could live with under the difficult economic conditions to which it was subject.

### A

■ The Board found that Horsehead violated its statutory duty to bargain in good faith by causing undue delay at various points in the negotiations. In this connection the Board pointed to the facts that Horsehead postponed the mid-January negotiating start, leaving only three weeks before the existing agreement expired; that the company waited until a few days before the expiration of the old contract before offering any wage increase, after which the company's negotiators said they were unable immediately to contact their New York superiors about the union's counterproposals; and that after postponing the meeting scheduled for Sunday, February 27, 1994, on the weekend of the bomb threat and fire, Horsehead declared an impasse and locked out the work force. (The Board ignored the fact that the company did not rely on the supposed "impasse" to excuse it from further negotiations, however; on the contrary, as we have seen, the company took the initiative in pressing forward with negotiations that ultimately proved successful.)

■ The National Labor Relations Act requires the parties "to meet at reasonable times and confer in good faith ..., but such obligation does not compel either party to agree to a proposal or require the making of

a concession...." 29 U.S.C. § 158(d). A company's good faith is judged by whether, in the totality of the circumstances, the company "desired 'to reach ultimate agreement, to enter into a collective bargaining contract.'" *Pease Co. v. NLRB,* 666 F.2d 1044, 1049 (6th Cir.1981) (quoting *NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 485, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982). Subject to the qualifications noted below, it is not up to the ALJ or the Board to pass judgment on either "the timing [or] quality of the Company's concessions." *Pease,* 666 F.2d at 1050.

■ Although undue delay calculated to undermine the bargaining process will constitute bad faith, see *Kobell v. United Paperworkers Int'l Union,* 965 F.2d 1401, 1408 (6th Cir.1992), a "lack of good faith may not be found merely because a party attempts to secure provisions that the other party deems unacceptable, but rather may be found only from 'conduct clearly showing an intent not to enter into a contract of any nature.'" *Pease,* 666 F.2d at 1049 (quoting *NLRB v. United Clay Mines Corp.,* 219 F.2d 120, 125 (6th Cir.1955)). It is true, to be sure, that "unusually harsh and unreasonable proposals may support a finding of bad faith bargaining." *Id.* at 1050. In the case at bar, however, the Board was unwilling to tar Horsehead's proposals with this brush. "[W]e find it unnecessary to rely on the [administrative law] judge's characterization of the Respondent's substantive bargaining proposals as deficient," the Board declared in footnote 7 of its decision and order.[8]

Unlike the ALJ, the Board rested its decision as to bad faith almost entirely on Horsehead's "dilatory tactics." The facts on which the Board relied, however, simply do not demonstrate bad faith delay or evasion of the bargaining process. Thus union representative Williams' own testimony showed that the original agreement on a mid-January starting date for the negotiations was only "tentative." It was perfectly reasonable that Ms. Koletar, being new to her job, would need more time to prepare, and the ultimate starting date of February 7 was clearly not so late as to constitute a refusal to bargain. While three weeks may not be a great deal of time in which to negotiate a renewal agreement, we note that the original collective bargaining agreement was negotiated in substantially less time than that. And Member Cohen, in his limited concurrence, declined to rely on Horsehead's change of the initial bargaining session from mid-January to February 7.

■ Mr. Cohen also declined to fault Horsehead for not proposing a wage increase until February 25. In this too, we believe, he was correct. Horsehead's failure to counter the union's wage proposal until February 25 is not significant, the parties having agreed to leave consideration of all economic issues until last. There is no evidence that the union objected to this schedule.

This case does not involve anything close to the pattern of delay found in *Calex Corp. v. NLRB,* 144 F.3d 904 (6th Cir.1998) (bad faith found where company refused to meet more than one or two times per month and canceled seven meetings, causing long lapses between bargaining sessions). Horsehead participated in nine days of bargaining between February 7 and February 25. Although under no obligation to do so, it offered a significant wage increase. When an act of arson was committed at the Horsehead plant, the company took a day to try to contain the damage and regroup. It then returned to the table on Monday, February 28, with an innovative wage offer indexed to the market on which the company's financial health was substantially dependent. The company bargained until 9 p.m. on that Monday and offered to continue bargaining the next day under the old contract. These are simply not the acts of a company uninterested in reaching agreement on a contract.

■ Failing to "take into account whatever in the record fairly detracts from" its determinations, *Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456, the Board ignored much of this evidence of Horsehead's manifest desire to reach agreement. The Board criticized Horsehead's cancellation of the Febru-

---

8. In this footnote the Board also "disavow[ed] any implication in the judge's decision that in order to be deemed lawful, a lockout must be preceded by an impasse in bargaining."

**340**

ary 27 meeting, but failed to mention the arson in this connection; neither did the Board acknowledge the long hours which President Quirk and his negotiators spent preparing for the next bargaining session. And although the Board emphasized the union's concessions and willingness to continue negotiations on February 28, it glossed over the fact that Horsehead came to the table with a newly-structured wage offer and an offer to extend the current contract and thus postpone any possibility of a lockout. This offer to extend the contract, like the subsequent letter stating that Horsehead "is willing to meet ... in an effort to resolve the deadlock," flies squarely in the teeth of the ALJ's suggestion that Horsehead prematurely declared an impasse in order to justify the lockout.[9]

■ The ALJ and the Board made much of the fact that, at a crucial time on February 25, the Horsehead negotiators claimed an inability to communicate with their superiors in New York and a lack of authority to respond to the union's lowered wage proposals. In context, this evidence is hardly sufficient to support the Board's finding that Horsehead refused to bargain in good faith. In addition to the nine meetings up to this point, the evidence shows continued serious bargaining, substantial personal involvement by the company's president, development of a creative new offer to address the union's desire for more money within the economic constraints facing the company, and an offer to extend the expired contract to facilitate further bargaining. Just as the Board has no authority to pass judgment on the content of bargaining proposals (at least if the proposals are not unusually harsh and unreasonable), the Board is not empowered to flyspeck a party's choice of bargaining tactics. See *Insurance Agents'*, 361 U.S. at 488, 80 S.Ct. 419 (holding that, subject to the duty to bargain in good faith, "parties should have wide latitude in their negotiations"). To borrow a formulation employed in *Pease*, 666 F.2d at 1048–49, "the Board erred in not finding that the Company simply was engaged in lawful hard bargaining." In light of

the fact that none of the evidence in this case rises to the level of a bad faith pattern of delay, the Board's reliance on the negotiators' alleged inability to reach their New York superiors for a short time was clearly unjustified.

■ The Board's decision to exclude or disregard evidence of the parties' activities after the contract expired on March 1 was also unjustified, in our view. If permitted to do so, Horsehead would have shown that the parties continued to bargain after March 1— at Horsehead's initiative—and ultimately, following nine months of negotiations, reached agreement on a new contract. The question before the Board was whether, as the General Counsel alleged in his complaint, the company "met with the Union with no intent to reach a collective bargaining agreement...." While by no means dispositive of that question, evidence of the continuing negotiations after the old contract expired would have been at least marginally probative of the company's good faith desire to reach an agreement before expiration.

### B

■ Our conclusion that the Board had no legitimate basis for finding Horsehead guilty of bargaining in bad faith is dispositive of the question whether the lockout was unlawful. A lockout is a lawful economic weapon when used to support a legitimate bargaining position of the employer, or to prevent sabotage; it is unlawful only if motivated by a "hostility to the process of collective bargaining" and a desire to evade bargaining. *American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 308–09, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Here there is simply no evidence that Horsehead used the lockout to undermine the bargaining process.

### C

■ The ALJ found, and the Board agreed, that Horsehead violated 29 U.S.C. § 158(a)(1) by its use of video cameras to

---

**9.** Although the March 4th letter to the employees spoke of an impasse, this appears to have been nothing more than an inept choice of words. As

the continuing text of the letter shows, Horsehead was certainly not attempting to declare an impasse in order to end the negotiations.

maintain indiscriminate surveillance of union picketers who, as the ALJ found, were "well off Company property." This court has held that "[p]hotographing of pickets does not violate Section 8(a)(1) of the Act where the photographs are taken to establish for the purposes of an injunction suit that pickets engaged in violence." *Larand Leisurelies, Inc. v. NLRB,* 523 F.2d 814, 819 (6th Cir. 1975). Horsehead videotaped four picketers engaging in acts of violence, and the ALJ relied on the videotape in upholding the discharge of the four men in question. It was clearly not an unfair labor practice to photograph the four miscreants. Likewise, the videotaping of company vehicles crossing the picket line and the use of camera cars to patrol the plant perimeter and escort replacement employees did not interfere with employees' protected concerted activity. These were justified precautions against potential violence.

For the most part, however, the picketing seems to have been peaceful. To the extent that the Board's finding of an unfair labor practice was based on surveillance that went beyond videotaping the access to front gate, the plant perimeter and the company cars, we conclude that it was supported by substantial evidence. The surveillance of union members who were in no way engaged with company personnel or property, but were merely talking among themselves or moving to and from the picket shack and the portable restroom, was unjustified. We are satisfied that it was within the Board's province to find that Horsehead went too far in its surveillance activities.

To the extent indicated, Horsehead's petition for review is **GRANTED** and the Board's application for enforcement is **DENIED**. The Board's application for enforcement of its order is **GRANTED** insofar as it pertains to the unjustified videotaping, but not otherwise.

BOYCE F. MARTIN, JR., Chief Judge, dissenting.

The question before this Court is whether there is substantial evidence to support the National Labor Relations Board's decision— not whether the Board made the correct decision. Were we to try this case anew, we might, and I emphasize the word "might," reach a result different from that reached by the Board. We are not trying this case anew, however. As an appellate court, we are bound by certain constraints. We do not find facts, and we review the lower courts' decisions under varying degrees of deference. We have received this appeal from an administrative board, and we therefore review the Board's decision to determine whether there is substantial evidence in the record to support the decision of the Board. I believe there is sufficient evidence on the record to support the Board's decision. I therefore respectfully dissent.

## I. Standards of Review

The standards of review are the crux of this case. They determine the bounds of our inquiry into the Board's decisionmaking process. We review the Board's factual findings under a substantial evidence standard. *See* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Board's application of the law to the facts is also reviewed under a substantial evidence standard. *See NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir.1993). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). In reviewing the substantiality of the evidence, this Court "must take into account whatever in the record fairly detracts from [the evidence's] weight," and we do so by reviewing the record as a whole. *Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456. A reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Id.* In essence, under the substantial evidence standard of review we are asked to weigh the quantum of evidence supporting

the Board's decision. If there is sufficient evidence, and it is in rough parity with or in excess of the evidence going against the Board's decision, we should enforce the Board's decision. *See, e.g., YHA, Inc. v. NLRB*, 2 F.3d 168, 172 (1993) (noting that "this court cannot substitute its own findings for those of the Board merely because substantial evidence may support both").

## II. Facts

The majority presents a lengthy rendition of the facts, and I will emphasize only a few in my dissent. In reference to the trailer fire, someone labeled "K," probably Horsehead Director of Operations Thomas Knepper or perhaps Horsehead negotiator Martha Koletar, is quoted as saying during a bargaining session that: "We realize it could also have been a visit by Clymersville personnel as they have already demonstrated their ability." The phrase "Clymersville personnel" appears to refer to a group of people who were suing Horsehead for environmental damage. This group also may include the person whom the majority opinion refers to as a "kindly environmentalist in Clymersville." *See supra* at 336. According to the majority, Knepper declined to blame union members for the fire because he did not want to antagonize the union negotiating team. *See supra* at 335 n. 6. Indeed, Horsehead was so solicitous of the tender feelings of the union members that it declined even to question its employees regarding the source of the fire.

Horsehead delayed the onset of negotiations until early February, and the parties agreed to begin the negotiations by focusing on non-economic issues. The majority acknowledges that Horsehead did not make a wage proposal at the initial, February 7 meeting. Even after Horsehead made its February 25 wage proposal, the negotiations followed a stop-and-start pattern. During meetings on the 25th, Horsehead negotiators said they were having difficulty reaching company higher-ups in New York City. For reasons that remain unclear, although union representative John Williams testified in the administrative hearing that "we offered to meet the whole weekend of the 26th and

27th," no meeting was scheduled for Saturday, February 26. Horsehead then canceled a meeting scheduled for Sunday, February 27. The majority points out that Horsehead's Knepper testified that the union's Williams "had no objection to cancellation of the Sunday meeting." *See supra* at 335. Williams's testimony, however, seems to indicate that he intended to meet on Sunday. When asked: "Did you meet on Sunday the 27th?" Williams responded:

> At 12:00 o'clock I drove in. When I got here I met with the committee to try and find out what was happening and we did. Then the mediator come to my room. I was staying at the Holiday Inn. He said that he would come back—he called Ms. Koletar and she was the only one there. She said that she'd meet with us but the rest of the people were at the plant so there was no meeting on Sunday.

The next time economic proposals were discussed was on February 28, the day before the collective-bargaining agreement was due to expire.

## III. Analysis

### A. Bargaining

The majority and I basically agree on the standards under which good or bad-faith bargaining should be judged. We differ primarily on the question of whether there is substantial evidence on the record to support a conclusion that Horsehead engaged in dilatory, bad-faith bargaining. I continue to believe the evidence is substantial and sufficient to support the Board's decision.

Although I generally agree with the majority's framing of the question of how to judge bargaining, I would like to emphasize a few points. The majority notes that "[a] company's good faith is judged by whether, in the totality of the circumstances, the company 'desired "to reach ultimate agreement, to enter into a collective bargaining contract." ' " *See supra* at 339 (quoting *Pease Co. v. NLRB*, 666 F.2d 1044, 1049 (6th Cir.1981) (quoting *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 485, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960))). I would like to emphasize the "totality of the circumstances" element of the majority's equation. Although I

believe that a desire to enter a contract can be indicative of good-faith bargaining, I do not believe it is or should be dispositive. *See NLRB v. General Elec. Co.*, 418 F.2d 736, 761–62 (2d Cir.1969) (" '[D]esire to reach agreement' may mean different things to different people, but in the context of a meaningful and purposeful reading of section 8(a)(5) it must mean more than a willingness to sign a piece of paper. The statute does not say that any 'agreement' reached will validate whatever tactics have been employed to exact it."). Were desire to enter a contract—any contract no matter how onerous to the employees—the only criterion for judging bargaining, an employer would seldom, if ever, be found to have acted in bad faith. What employer, for instance, would not desire to enter a contract that guaranteed employees minimum wage, no medical or life insurance, and no vacation days? To continue a conceit introduced by the majority, it would be fair to describe such an agreement as a "Dickensian Contract." I find it difficult to believe that simply evincing a desire to enter a "Dickensian Contract" would satisfy an employer's duty to bargain in good faith.

There must be something more to the determination of whether an employer has acted in bad faith. The Court in *Pease* appears to have considered more than merely a desire to enter a contract. As the Court noted: "Our examination of the specific indicia relied on by the ALJ and the Board leads us to conclude that neither the proposals nor the tactics of the Company, nor the sum of its conduct, amounts to substantial evidence of bad faith." *See Pease*, 666 F.2d at 1049. As noted by the majority, undue delay can constitute bad faith. *See supra* at 338–39. *See also Calex Corp. v. NLRB*, 144 F.3d 904, 909 (6th Cir.1998) ("Dilatory and delaying tactics that undermine the process of collective bargaining are indicative of bad faith bargaining."); *Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1408 (6th Cir.1992) ("Dilatory or evasive tactics have been considered by the Board as indicative of bad faith.").

According to the majority, "[t]his case does not involve anything close to the pattern of delay found in *Calex* . . . ." *See supra* at 339. The majority is correct in this analysis— *Calex* involves an extreme example of dilatory bargaining tactics. The majority's analysis, however, is also misleading. The comparison between the facts of the case at hand and those of *Calex* is true as far as it goes, but it does not answer the question of whether Horsehead has engaged in dilatory bargaining. Just because Horsehead has not acted as egregiously as Calex Corporation does not mean that Horsehead has bargained in good faith. *Calex* does not provide a baseline level for judging dilatory tactics. I see *Calex* rather as an extreme example and believe that a company can run afoul of the labor laws, as Horsehead has here, without reaching the level of obstructionism exhibited in *Calex*.

The majority contends that the Board erred in refusing to consider Horsehead's proffered evidence of post-lockout negotiations and contract resolution. I believe the Board acted correctly. Horsehead attempted to introduce affidavits in which the company's chief negotiator testified regarding the ongoing negotiations and their ultimate resolution in a completed contract. The majority argues that these affidavits would have been instructive on Horsehead's desire to reach an agreement and therefore show that the company did not negotiate in bad faith. No one doubts that Horsehead intended to reach an agreement—on its terms. The Board questioned the tactics Horsehead used prior to the lockout, and this pre-lockout bargaining bears no relation to post-lockout negotiations. Evidence of post-lockout negotiations is therefore not relevant to accusations of pre-lockout bad faith. *Cf. NLRB v. Ramona's Mexican Food Prods.*, 531 F.2d 390, 393 (9th Cir.1975) ("The ultimate terms of the post strike agreement reached after a long unsuccessful unfair labor practices strike infers more to the success of the Company officials' evasive, stalling, and unlawful tactics than it does to the presence of good faith bargaining."). Under the majority's reasoning, a company could engage in the most nefarious negotiating tactics possible, force a lockout to put pressure on the employees, and then attempt to clean up the mess with good-faith, post-lockout bargaining. Horsehead cannot

retroactively "cure" its prior negotiating tactics with post-lockout bargaining, and evidence regarding these activities has no relevance to pre-lockout activities.

## B. Lockout

Because the majority determined that Horsehead did not bargain in bad faith, it found that the lockout was lawful. I contend that there was substantial evidence to support a finding that Horsehead engaged in bad-faith bargaining, and I believe the lockout was an outgrowth of this activity.

Lockouts are not per se unlawful. *See American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) (holding that "employer violates neither § 8(a)(1) nor § 8(a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position"). A lockout can, however, be unlawful if it is implemented out of hostility to the process of collective bargaining. *See id.* at 309, 85 S.Ct. 955.

Horsehead claims it resorted to a lockout to avoid further sabotage to its plant. The only incident of alleged sabotage before the lockout, however, was the burning of the trailer. In that situation, arson was not definitively proven, nor was it determined that union members had set the fire. According to negotiation notes from the time of the fire, Horsehead management discussed the possibility that people from Clymersville were involved. Horsehead management also declined to question any of the union members who were on duty at the time of the fire. The other alleged incidents of sabotage—the cutting of the conveyor belt, the jamming of the recycling pipelines, and the like—were discovered after the lockout began. Horsehead may have had a legitimate fear of sabotage, but, in light of the Board's finding of bad-faith bargaining, I agree with the Board that the lockout was a product of this bargaining and therefore unlawful.

## C. Videotaping

I agree with the majority that Horsehead engaged in indiscriminate videotaping of un-ion activities in violation of 29 U.S.C. § 158(a)(1).

## IV. Conclusion

This case is the product of a bitter labor dispute. Both sides played hardball. The Board, however, concluded that Horsehead crossed the line and negotiated in bad faith. Given the substantial evidence on the record in support of the Board's decision, I believe the Board's cross-application for enforcement should have been granted and Horsehead's petition to review the Board's order should have been denied. I respectfully dissent.